R. Joseph Trojan, CA Bar No. 137,067
trojan@trojanlawoffices.com
Dylan C. Dang, CA Bar No. 223,455
dang@trojanlawoffices.com
Francis Wong, CA Bar No. 284,946
wong@trojanlawoffices.com
TROJAN LAW OFFICES
9250 Wilshire Blvd., Suite 325
Beverly Hills, CA 90212
Telephone: 310-777-8399
Facsimile: 310-691-1086

Attorneys for Plaintiff,
Automotive Data Solutions, Inc.

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUTOMOTIVE DATA SOLUTIONS, INC., a Canada Corporation,<br><br>Plaintiff,<br><br>v.<br><br>DIRECTED ELECTRONICS CANADA INC., a Canada Corporation; DEI HOLDINGS, INC. (AKA DIRECTED ELECTRONICS, INC.), a Florida Corporation; DIRECTED, LLC, a Delaware LLC,<br><br>Defendants. | CASE NO. 2:18-cv-1560<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR FEDERAL MISAPPROPRIATION OF TRADE SECRETS, STATE LAW MISAPPROPRIATION OF TRADE SECRETS, COPYRIGHT INFRINGEMENT, PATENT INFRINGEMENT, AND CALIFORNIA UNFAIR COMPETITION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Automotive Data Solutions, Inc. (hereinafter, "ADS" or "Plaintiff") hereby complains and alleges as follows:

## I. PARTIES:

1. Automotive Data Solutions, Inc. is a corporation organized and existing under the laws of Quebec, Canada, having its principle place of business at 8400 Bougainville, Montreal, QC H4P 2G1, Canada.

2. Upon information and belief, Defendant Directed Electronics Canada Inc. (hereinafter "Directed Canada") is a company organized under the laws of Quebec, Canada, having its principal place of business at 2750 Alphonse-Gariepy St., Lachine, Quebec, H8T 3M2, Canada.

3. Upon information and belief, Defendant DEI Holdings, Inc. (d.b.a., Directed Electronics, Inc.) (hereinafter "DEI") is a company organized under the laws of the State of Florida, having its principal place of business at 1 Viper Way, Vista, CA 92081.

4. Upon information and belief, Defendant Directed, LLC (hereinafter "Directed") is a company organized under the laws of the State of Delaware, having its principal place of business at 1 Viper Way, Vista, CA 92081.

5. ADS is informed and believes, and on that basis alleges, that each Defendant is and/or was an agent, servant, co-conspirator, and/or employee of each of the other Defendants, and in doing the things alleged was acting within the course and scope of said agency, conspiracy and/or employment. Therefore, each Defendant will be collectively referred to herein as "Defendants."

## II. JURISDICTION AND VENUE:

6. This Court has personal jurisdiction over DEI because DEI conducts business in this district and upon information and belief has sold products to consumers within

this district.

7. This Court has personal jurisdiction over Directed because Directed conducts business in this district and upon information and belief has sold products to retailers within this district.

8. This Court has personal jurisdiction over Directed Canada because Directed Canada conducts business in this district and upon information and belief has sold products to consumers within this district.

9. Venue is proper within this jurisdiction because, upon information and belief, sales of the accused products have occurred in this district and business operations are conducted in this district.

10. Subject matter jurisdiction is proper in this Court pursuant 28 U.S.C. § 1331 because this case arises under federal law, namely the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, federal copyright laws, 17 U.S.C. §§ 100 *et seq.*, and under United States patent law, 35 U.S.C. §§ 100 *et seq*. This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367 because the state law claim arises under the same set of facts as the federal law claims.

### III. GENERAL ALLEGATIONS:

**A. The Problem of Integrating Aftermarket Electronics Products Into The Original Electronic Equipment Systems in Vehicles**

11. This case involves the theft of intellectual property in the automotive aftermarket electronics industry. To understand the significance of this case requires a basic understanding of a fundamental problem in this industry. Aftermarket electronics include such products as stereo systems, remote starters for cold climate regions, navigation systems, video entertainment systems, backup cameras, and the like. Consumers expect that these aftermarket products be seamlessly integrated into

-2-

the existing electronics in their cars. For example, remote starters must be able to access the computerized data bus system of vehicles in order to remotely start the vehicles at a distance.

12. Vehicle manufacturers do not support aftermarket electronics when designing the computer systems in vehicles. As vehicles have become more computerized, the manufacturers of aftermarket integration products have had to commit significant engineering resources to the task of making their products compatible with the computer systems in vehicles. This challenge has been compounded by the fact that electronic ignition systems offer different immobilizer technologies depending on the vehicle brand or vehicle platform. Aftermarket products must be continually updated to support a variety of immobilizer technologies for the purposes of remote start, requiring the maintenance of significant engineering resources for any company in the remote start field. Hence, accessing a vehicle's electronics to integrate aftermarket products requires a unique integration solution for every vehicle.

13. Plaintiff is a manufacturer of electronic devices that enable the integration between a vehicle and aftermarket remote starters. One of the challenges in this integration is bypassing vehicles' anti-theft system. Practically speaking 100% of all vehicles sold in Canada, and a predominant percentage of vehicles sold in the United States, have antitheft devices with transponder chips in the keys. These vehicles require the factory vehicle keys to enable the vehicle to start.

**B**. **Plaintiff Solved the Problem of Integrating Aftermarket Remote Starter Products Into Vehicles By Developing Means to Decrypt the Communication Between Vehicle and Transponder Keys.**

14. ADS maintains a team of approximately 80 engineers in Quebec, Canada in order to keep up to date with the most current vehicle makes and models. The software developed to gain access to various makes and models of vehicles is highly

proprietary. ADS modules are locked and can only be accessed by a proprietary software called a bootloader that is particularly configured to decompile the software in that module. The software contains, *inter alia,* ten or so algorithms to decrypt 24, 40, 48, 96 or 128 encryptions. Some solutions took two years and thousands of engineering hours to develop. The bootloader is maintained as a trade secret at ADS in Quebec, Canada and the software is protected under the Berne Convention.

15. ADS is also the owner of United States Patent No. 8,856,780 (the "'780 Patent") for Method and System to Remotely Flash an External Module. Attached hereto as **Exhibit 1** is a true and correct copy of the '780 Patent. This patent further describes and claims ADS's innovative system for integrating its aftermarket products into vehicles.

16. The bootloader used to gain access to ADS's firmware in its modules is not readily available to ADS's competitors and was developed solely for ADS's use and benefit. Hereinafter, ADS's bootloader and ADS's firmware accessible using ADS's bootloader is collectively referred to as the "Confidential Software." ADS derives substantial benefit by maintaining the confidentiality of the Confidential Software, and disclosure of this software would be injurious to ADS.

17. ADS takes reasonable steps under the circumstances to maintain the secrecy of its Confidential Software. ADS uses numerous safeguards to preserve and maintain the confidentiality and privacy of Confidential Software and ensure that the source code is not disclosed outside of ADS, including by: (a) emphasizing to consultants and employees the need to keep ADS's software a secret; (b) requiring, as a condition of entering into a consultant relationship or employment, that all consultants and employees promise not to use or disclose this software except in the performance of their duties for ADS; (c) limiting access and/or restricting access to this software by consultants and employees on a need-to-know basis; (e) requiring

-4-

coded passwords to access the Confidential Software on ADS' computer systems; and (f) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on ADS' computer system, servers, and networks.

### C. Defendants Have Stolen and Used Plaintiff's Confidential Software, Thereby Violating Plaintiff's Trade Secret, Copyright, and Patent Rights.

18. ADS's bootloader is not accessible when an ADS module is purchased by the end user because the bootloader is locked. Without access to the bootloader, ADS's Confidential Software cannot be decompiled and used. Upon information and belief, Defendants have obtained unauthorized access into ADS's Confidential Software in the microprocessor of its modules. While Defendants may own the physical ADS modules that they purchase on the open market, the purchase of an ADS module does not come with a license to copy the Confidential Software contained in the locked microchips and does not come with a license to create derivative works based upon the locked Confidential Software regardless of the method used to access the Confidential Software. By stealing the Confidential Software, Defendants have been able to immediately decompile the firmware solutions for accessing new makes and models of vehicles, which have been developed by ADS's extensive engineering team. Defendants use these stolen solutions to create derivative works in order to bring their own aftermarket products to market at far less cost to Defendants than if they had developed these products on their own. In fact, upon information and belief, Defendants currently lack the engineering expertise to develop such products without stealing from ADS.

19. Upon information and belief, Defendants maintain a minimal engineering team that would be incapable of developing the software to integrate their products into

new makes and models of vehicles at the pace at which Defendants introduce new products.  Defendants have turned the theft of ADS's Confidential Software into a regular business practice in order to keep Defendants own products up to date. The regular theft of ADS's software solutions for new vehicles is further evidenced by the timing of Defendants' introduction of integration solutions for new vehicles, which consistently occurs shortly after ADS's introduction of solutions for the same makes and models of vehicles.

20.    Upon information and belief, Defendants have sold a product called Key2Go Car Key Replicator System ("Key2Go") through one of its brands called "Xpresskit Vehicle Integration."  As described by Key2Go's product advertisement, Key2Go is designed and developed to bypass automobile immobilizer technology in order to provide a remote starter solution.  Without Key2Go, newer automobiles will disable certain aftermarket products because the new automobile requires the presence of the automobile key inside the car before any further operation of the automobile is allowed.  Key2Go uses an array of servers to generate a duplicate of the original automobile key so that aftermarket companies can install and operate a remote starter and other hardware without the presence of an actual automobile key.  Upon information and belief, this technology described in connection with Key2Go is also used with respect to other products sold by Defendants.

21.    ADS had no way of knowing that the Defendants have been engaged in a pattern and practice of stealing ADS's intellectual property until the summer of 2017 when a former employee of the Defendants came to work for ADS.  In August, 2017, the ex-employee of the Defendants disclosed to ADS management that the Defendants had an established business practice of regularly stealing ADS's Confidential Software.   ADS also learned that this unlawful business practice had been going on for roughly the last ten years.

## IV.  FIRST COUNT:
## FEDERAL MISAPPROPRIATION OF TRADE SECRETS
## UNDER DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

22. Plaintiff ADS incorporates by reference each and every allegation contained in paragraphs 1 through 21 above as though fully set forth herein.

23. ADS operates its business and sells its products in interstate and foreign commerce, transacting and doing business with customers, vendors and others throughout the United States and internationally.

24. ADS conceives, designs, and develops trade secrets, as that term is defined under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b).

25. ADS developed Confidential Software applications to facilitate the compatibility of its aftermarket automobile remote start and security products with a myriad of make and models of vehicles.

26. ADS obtains economic value from its trade secrets through devoting substantial resources, time and investment to creating, developing and using such software. ADS also obtains actual economic value from its trade secrets not being generally known or readily ascertainable through proper means by another person or entity who could obtain economic value from the disclosure or use of the software.

27. ADS has taken reasonable steps and precautions to safeguard its trade secrets and to limit and restrict others outside of ADS from knowing, readily ascertaining or using its trade secrets, including limiting access to sensitive information and demanding the return of sensitive materials upon termination of the business relationship.

28. Defendants have willfully and maliciously misappropriated ADS's trade secrets by gaining unauthorized access to ADS's Confidential Software and utilizing

-7-

the Confidential Software in its own automotive aftermarket remote start and security products.

29. By engaging and continuing to engage in the conduct and activities described herein, Defendants have used and/or disclosed, threaten to use and/or disclose, or will inevitably use and/or disclose trade secrets of ADS.

30. Defendants' actual misappropriation of those trade secrets is causing ADS to suffer irreparable harm, including but not limited to loss of customers, loss of reputation and customer goodwill, and loss of its investment in its trade secrets. This harm cannot be adequately remedied at law and requires preliminary and permanent injunctive relief.

31. As a result of Defendants' improper misappropriation, disclosure and use of ADS trade secrets, they have violated the DTSA. ADS is entitled to full compensatory and consequential damages, as well as full attorneys' fees, costs and expenses. On information and belief, Defendants sale of modules developed using unauthorized copies of the Confidential Software and/or unauthorized derivative works made using the Confidential Software has resulted in harm to ADS in the form of lost incremental profits, lost convoy sales, and price erosion of $20,000,000 to $50,000,000 or lost profits according to proof.

32. Because Defendants' DTSA violations have been willful and malicious, ADS is entitled to exemplary damages of more than twice the amount of damages for any actual loss and any unjust enrichment.

## V.  SECOND COUNT:
## STATE MISAPPROPRIATION OF TRADE SECRETS
## UNDER CALIFORNIA UNIFORM TRADE SECRETS ACT
## CAL. CIV. CODE §§ 3426.1 et seq.

-8-

33. Plaintiff ADS incorporates by reference each and every allegation contained in paragraphs 1 through 32 above as though fully set forth herein.

34. ADS's Confidential Software alleged above constitutes trade secrets under the California Uniform Trade Secrets Act (California Civil Code sections 3426 et seq.), and contains information which is not generally known to the public or to ADS' competitors, who can obtain economic value from its disclosure and use it in their own interest since it was compiled based on ADS investment into research and development of software code to ensure the compatibility of its aftermarket automobile hardware with a myriad of make and modes of automobiles.

35. The Confidential Software is ADS's most valuable asset in that it gives ADS a significant competitive advantage over others. As set forth herein above, ADS has made reasonable efforts to keep this software secret, including requiring its consultants and employees to follow confidentiality rules and policies and implementing security systems on its computer system to prevent unauthorized access or disclosure.

36. Defendants' actions with respect to ADS's Confidential Software, as alleged above, were a deliberate scheme and plan to deprive ADS of the benefits of its own substantial investment and efforts and to give Defendants an unfair competitive advantage.

37. As a proximate result of Defendants' acts as alleged above, ADS to date has suffered, and will continue to suffer, actual damages in an amount to be proven at trial.

38. As a further proximate result of the misappropriation, ADS is informed and believes that Defendants have been unjustly enriched as a result of Defendants' misappropriation of ADS Confidential Software. The amount of this unjust enrichment cannot presently be ascertained.

39. ADS is informed and believes that Defendants continue to use ADS's misappropriated Confidential Software. Defendants' conduct therefore threatens further wrongful use, destruction and misappropriation of ADS's Confidential Software. Defendants intend to take advantage of ADS's investment into the creation of its software to take customers who would otherwise choose to do business with ADS.

40. As a proximate result of Defendants' acts as alleged above, ADS will continue to suffer actual damages in an amount to be proven at trial unless Defendants are enjoined.

41. ADS has no adequate remedy at law for its injuries unless and until Defendants are restrained from using ADS' misappropriated Confidential Software in the future, because calculations of damages will be difficult and ADS will be compelled to bring multiple suits to protect its interest. ADS' damages include, but are not limited to, ADS' lost profits on its sales in an amount to be proven at trial.

42. ADS is entitled to temporary, preliminary and permanent injunctions, as prayed for herein, prohibiting Defendants from further acts of misuse of ADS' Confidential Software, as alleged herein.

43. On information and belief, Defendants sale of modules developed using the trade secrets stolen from ADS has resulted in lost incremental profits, lost convoy sales, and price erosion in the amount of $20,000,000 to $50,000,000 or lost profits according to proof.

44. ADS is informed and believes that Defendants' conduct was, and is, malicious, fraudulent, deliberate and willful, as revealed by Defendants' conduct described above. ADS is therefore entitled to recover from Defendant exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by California Civil Code section 3426.3.

45. ADS also is entitled to an award of attorneys' fees pursuant to California Civil Code section 3426.4.

## VI. THIRD COUNT:
## COPYRIGHT INFRINGEMENT

46. Plaintiff ADS incorporates by reference each and every allegation contained in paragraphs 1 through 45 above as though fully set forth herein.

47. ADS is the author and owner of the Confidential Software. As a Canadian company with its principal place of business in Canada, ADS is entitled to sue for infringement of its copyrights in United States federal court without first obtaining a United States copyright registration because 17 U.S.C. § 411 only requires registration for United States copyrights. To conform to the treaty obligations under Berne Convention requiring reciprocal rights, Congress amended the Copyright Act to grant federal jurisdiction for foreign copyrights in cases in which the foreign country does not require registration to enforce its copyrights. Canada is also a member of the Berne Convention. Canada does not require copyright registration for enforcement of copyrights. Since Americans can sue to enforce their copyrights in Canada without a Canadian copyright registration, the Berne Convention imposes a reciprocal obligation on American courts to allow Canadians to sue on their copyrights in the United States without a U.S. copyright registration. Hence, this court has jurisdiction over ADS's copyright claims.

48. The products that Defendants have sold made use of at least one copied version of the Confidential Software and made use of derivative works based on the use of the Confidential Software. Such unauthorized use of copies of the Confidential Software and/or unauthorized derivative works made using the Confidential Software constitutes copyright infringement in violation of 17 U.S.C. § 501.

49. On information and belief, Defendants knew that the Confidential Software was an unauthorized copy and/or unauthorized derivative works made using the Confidential Software. Despite the fact that Defendants knew that the copy was unauthorized, Defendants knowingly, deliberately, intentionally and willfully reproduced and distributed unauthorized copies of Plaintiff's works.

50. On information and belief, Defendants sale of modules developed using unauthorized of copies of the Confidential Software and/or unauthorized derivative works made using the Confidential Software has resulted in harm to ADS in the form of lost incremental profits, lost convoy sales, and price erosion of $20,000,000 to $50,000,000 or lost profits according to proof.

## VII. FOURTH COUNT:
## INFRINGEMENT OF U.S. PATENT NO. 8,856,780

51. Plaintiff ADS incorporates by reference each and every allegation contained in paragraphs 1 through 50 above as though fully set forth herein.

52. ADS is the owner of US Patent No. 8,856,780 ("'780 Patent").

53. Defendants sell modules that are adapted to be programmed by an installer using Defendants' Key2Go System. For purposes of infringement, the Defendants' Key2Go System is representative of the remote starter and security system products that infringe upon the '780 patent. Key2Go has been designed and developed to bypass higher levels of encryption found in newer vehicles to generate a "secret key" using the microprocessor on board the interface module in order to replicate a key. Upon information and belief, Key2Go uses an array of servers to generate a duplicate of the original key, enabling the installation of a remote starter without having to give up a key. Defendants' Key2Go System has all of the elements of at least claims 1 and 15 of the '780 Patent.

54. The '780 Patent claims a method to remotely flash an external module. For example, in Claim 1, the method is comprised of a first step of electronically transferring a first computer program from a computer device to the external module. Upon information and belief, in the Key2Go system the installer starts the process by connecting the external module (for example, the DBALL module) to XpressVIP 4.5 and flashing it with the Key2Go-compatible firmware.

55. The second step of the '780 Patent's method is to at least partially install the external module in a vehicle. The third step of the '780 Patent's method is to extract key data from a security device located in the vehicle using the first computer program. Upon information and belief, in the Key2Go system, the external module is then installed in the vehicle and used to capture a sample set of data that will be the information on which the Key2Go server relies for the next step.

56. The fourth step of the '780 Patent's method is to transfer the key data to the computer device. Upon information and belief, in the Key2GO system, once the sample data has been acquired by the interface module, the installer now plugs it back into the PC (via XpressVIP 4.5).

57. The fifth step of the '780 Patent's method is to use a second computer program not installed on the external module to analyze and process the key data and generate a third computer program allowing the external module to communicate with the security device. The last step of the '780 Patent's method is to transfer the generated third computer program to the external module. Upon information and belief, the Key2GO system uses a second computer program to analyze and process the key data. It generates a third computer program allowing the external module to communicate with the security device, which is then transferred to the external module. When the flashing process is complete, the external module is installed back into the vehicle for use.

58. As a consequence, the Defendants are infringing the '780 Patent under 35 U.S.C. § 271(a) by virtue of Defendants engaging in the advertising, offering for sale, and selling of modules programmed using Defendants' Key2Go System in the United States, and/or specifically designed to do the same, and/or engaging in such actions through distributors, agents, and or related third parties.

59. Defendants provide specific instructions to installers of Defendants' modules that teach installers how to use of the Key2Go System to program and install Defendants' modules in customer vehicles. By engaging in such actions, Defendants are actively inducing infringement the '780 Patent for which the Defendants are liable under 35 U.S.C. § 271(b).

60. Defendants are also liable as contributory infringers under 35 U.S.C. § 271(c) because the Defendants (a) offer to sell and sell within the United States Defendants' modules designed to be programmed using Defendants' Key2Go System for use in practicing the patented process claimed in the '780 Patent; (b) Defendants' modules designed to be programmed using Defendants' Key2Go System constitute a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the claims of the '780 patent; and, (c) Defendants' modules designed to be programmed using Defendants' Key2Go System are not a staple article or commodity of commerce suitable for substantial non-infringing use.

61. As a consequence of such infringement, ADS has been harmed by the infringement in the form of lost sales. On information and belief, Defendants sale of modules has resulted in harm to ADS in the form of lost incremental profits, lost convoy sales, and price erosion of $20,000,000 to $50,000,000 or lost profits according to proof.

62. As a result of the infringement, ADS is entitled to injunctive relief, lost profits, treble damages, and attorney fees under 35 U.S.C. § 285 et seq, according to proof,

against Defendants.

## VIII. FIFTH COUNT:
## UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200

63. Plaintiff ADS incorporates by reference each and every allegation contained in paragraphs 1 through 62 above as though fully set forth herein.

64. By engaging in the above-described practices and actions, Defendants have committed one or more acts of unfair competition within the meaning of California *Business and Professions Code* ("BPC") §§ 17200 *et seq*. As used in this Complaint, and in BPC § 17200, "unfair competition" means (1) an unlawful, unfair or fraudulent business act or practice; (2) unfair, deceptive, untrue or misleading advertising; and/or (3) an act prohibited by Chapter 1 (commencing with BPC § 17500). This conduct as alleged is actionable pursuant to BPC §§ 17200 and 17203.

65. Defendants have engaged in, and continue to engage in, such unfair competition with full knowledge that such acts and practices are wrongful, arbitrary, without reasonable business or commercial justification, unethical, oppressive, and have caused substantial harm and injury to ADS.

66. Moreover, Defendants'' conduct, as described above, is unlawful, unfair, and deceptive, and violates BPC §§ 17200 *et seq*. and constitutes *inter alia*, trade secret misappropriation, copyright infringement, and patent infringement resulting in injury in fact to ADS in form of lost revenue, lost profits, lost market share, lost business value and goodwill, and lost business opportunities as a result of Defendants' unlawful actions and practices in violation of BPC sections 17200 *et seq*.

67. As a direct and proximate result of Defendants' unlawful conduct, ADS is entitled to restitution and disgorgement of profits in an amount according to proof at trial and entitled to preliminary and permanent injunctive relief restraining

TROJAN LAW OFFICES
BEVERLY HILLS

Defendants, their officers, directors, members, agents and employees, and all persons acting in concert with it, from engaging in any further acts in violation of Section 17200 of the California Business and Professions Code.

68.   To prevent future harm, Defendants must be ordered to immediately cease and desist from any further use and distribution of the Confidential Software.

## IX.  DEMAND FOR JURY TRIAL:

Plaintiff hereby exercises its right to a jury trial under the Seventh Amendment to the United States Constitution and hereby demands a jury trial in accordance therewith.

## X. PRAYER OF RELIEF:

WHEREFORE, Plaintiff ADS prays as follows:

1.   That Plaintiff be awarded judgment in its favor and against Defendants;

2.   Temporary, preliminary, and permanent injunctive relief, including a temporary restraining order, prohibiting any further wrongful possession, disclosure, and/or use of ADS' Confidential Software, including, but not limited to, any and all copies, electronically stored information, drafts, memos or other memorialized versions of ADS' Confidential Software, and preventing Defendants from profiting or benefiting from their wrongful conduct;

3.   An order that Defendants return to ADS, and then purge from their possession, custody and control, any and all documents, computer-based files or data, or information in any form, whether originals, copies, compilations or derivations, which were removed from ADS or the ADS-affiliated computers, and databases;

4.   An order that Defendants return to ADS any and all confidential and/or trade secret information of ADS, and an order prohibiting any further use or benefit from the use of said information;

-16-

5. An order that Defendants return any and all computer memory storage devices containing ADS' Confidential Software that have not already been returned to ADS for the purposes of ADS inspecting such memory devices (such as laptop computers, personal home computers, and personal mobile devices) and deleting such Confidential Software from these computers' storage memory devices;

6. An award of general, special, consequential, and compensatory damages to ADS in an amount to be determined at a hearing and/or trial including, but not limited to, all amounts Defendants received for contracts they entered into, solicited, procured or negotiated while using, utilizing, referencing or relying on ADS' Confidential Software;

7. An award of costs of ADS' investigation of the extent of Defendants' taking and misappropriation of ADS' Confidential Software;

8. An order directing that Defendants disgorge all gross revenues and profits that they or anyone acting in concert or participation with them received as a result of Defendants' wrongful conduct, in an amount to be determined at trial;

9. An award of enhanced damages by two times pursuant to 18 U.S.C.A. § 1836(b)(3)(C);

69. An award of lost incremental profits, lost convoy sales, and price erosion damages of $20,000,000 to $50,000,000 or damages according to proof.

10. Awarding ADS' lost profits as a result of Defendants' infringement of U.S. Patent No. 8,856,780 and treble damages pursuant to 35 U.S.C. § 284.

11. Awarding ADS' costs, attorney's fees, investigatory fees and expenses to the full extent provided by 35 U.S.C. § 285;

12. An award of punitive damages in accordance with Cal. Civ. Code § 3294 of an amount adequate to punish and deter Defendants from engaging in the theft of the Confidential Software;

-17-

13. Interest on all damages, according to proof; and

14. Any and all other relief the Court deems just.

          Respectfully submitted,

          TROJAN LAW OFFICES
          by

February 26, 2018          /s/R. Joseph Trojan
                                          R. Joseph Trojan
                                          Attorneys for Plaintiff ADS

TROJAN LAW OFFICES
BEVERLY HILLS