COOLEY LLP
STEPHEN R. SMITH (*pro hac vice*)
(stephen.smith@cooley.com)
SAMUEL K. WHITT (284770)
(swhitt@cooley.com)
EMILY E. TERRELL (234353)
(eterrell@cooley.com)
1299 Pennsylvania Avenue NW
Suite 700
Washington DC 20004-2400
Tel:  202-842-7800
Fax:  202-842-7899

Attorneys for Defendants and
Counterclaim-Plaintiffs

REBECCA L. TARNEJA (293461)
(rtarneja@cooley.com)
1333 2nd Street, Suite 400
Santa Monica, CA  90401
Tel:  310-883-6400
Fax:  310-883-6500

MATTHEW J. BRIGHAM (191428)
(mbrigham@cooley.com)
SARAH B. MOORE (292974)
(smoore@cooley.com)
3175 Hanover Street
Palo Alto, CA 94304-1130
Tel:  650-843-5000
Fax:  650-849-7400

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUTOMOTIVE DATA SOLUTIONS, INC., a Canada Corporation,<br><br>Plaintiff,<br><br>v.<br><br>DIRECTED ELECTRONICS CANADA INC., a Canada Corporation; DEI HOLDINGS, INC. (AKA DIRECTED ELECTRONICS, INC.), a Florida Corporation; DIRECTED, LLC, a Delaware LLC; JIM MINARIK, an individual; KEVIN DUFFY, an individual; ROBERT STRUBLE, an individual; TAREK KUTRIEH, an individual; MINAS MINASSIAN, an individual; Defendants.<br><br>And Related Counterclaims. | Case No.  2:18-cv-01560 GW<br><br>**REDACTED VERSION**<br><br>**DEFENDANTS' OPENING SUPPLEMENTAL BRIEF IN SUPPORT OF SUMMARY JUDGMENT BRIEFING**<br><br>Judge: Hon. George H. Wu<br><br>Date:  December 5, 2019<br>Time:  8:30 am<br>Location: 9D |

# TABLE OF CONTENTS

I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NO
COPYRIGHT INFRINGEMENT (d.i. 207).............................................1

    A.   Introduction...........................................................................1

    B.   Argument ..............................................................................2

    C.   Conclusion ..........................................................................10

II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NO ALLEGED
TRADE SECRET MISAPPROPRIATION (D.I. 217).......................10

    A.   Introduction.........................................................................10

    B.   Can an entity have valid ownership of a "trade secret" that resulted from
reverse engineering of another company's source code? ...........11

    C.   If so, must the technology or codes be materially different? ...............12

    D.   If so, to what extent must the technology over which the trade secret is
asserted be different than the original technology? ..................15

    E.   Conclusion ..........................................................................17

III.  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON PATENT
CLAIMS (D.I. 213)...............................................................................17

    A.   Claim Construction of Term from '185 Patent............................17

    B.   Claim Construction of Terms from '400 Patent ..........................20

    C.   Conclusion ..........................................................................22

# TABLE OF AUTHORITIES

## CASES

*Alaska Stock, LLC v. Pearson Educ., Inc.*,
  975 F. Supp.2d 1027(D. Alaska 2013) ........................................................6

*Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.*,
  226 Cal. App. 4th 26 (2014) ....................................................................13

*Andrews v. McHale*,
  2016 FC 624, 141 C.P.R. (4th) 407 ......................................................7, 8

*Antonick v. Elec. Arts, Inc.*,
  841 F.3d 1062 (9th Cir. 2016) ..................................................................9

*Apple Comput., Inc. v. Microsoft Corp.*,
  35 F.3d 1435 (9th Cir. 1994) .................................................................3, 9

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
  489 U.S. 141 (1989)................................................................................12

*Bridgmon v. Array Sys. Corp.*,
  325 F.3d 572 (5th Cir. 2003) ....................................................................9

*Brocade Communs. Sys. v. A10 Networks*, Inc.,
  No. 10-CV-03428-LHK, 2011 U.S. Dist. LEXIS 91384 (N.D. Cal. Aug. 16, 2011) 9

*CCH Can. Ltd.* v. *Law Soc. of Upper Can.*,
  1999 CarswellNat 2123 (Can.) ..................................................................6

*CCH Can. Ltd.* v. *Law Soc. of Upper Can.*,
  2002 CAD 187, 2002 FCA 187 (Can.).......................................................6

*Chi. Lock Co. v. Fanberg*,
  676 F.2d 400 (9th Cir. 1982) ..................................................................12

*Compo Co. v. Blue Crest Music, Inc.*,
  1979 CarswellNat 640 (Can.) ....................................................................7

*Cyberiansoft v. M.M. Primas Group Inc.*,
  No. SACV0801019JVSMLGX 2010 WL 11507802 (C.D. Cal. Dec. 22, 2010) ......3

*Derek Andrew, Inc. v. Poof Apparel Corp.*,
  528 F.3d 696 (9th Cir. 2008) ....................................................................4

*DVD Copy Control Ass'n, Inc. v. Bunner*,
   31 Cal. 4th 864 (2003) .................................................................. 11

*Fleisher Studios, Inc. v. A. VE.L.A., Inc.*,
   654 F.3d 958 (9th Cir. 2011) ........................................................... 6

*Freeman Inv. Mgmt. Co., LLC v. Frank Russell Co.*,
   No. 13-CV-2856 JLS (RBB), 2016 U.S. Dist. LEXIS 136220
   (S.D. Cal. Sep. 30, 2016) ............................................................... 13

*Hilderman v. Enea TekSci, Inc.*,
   551 F. Supp. 2d 1183 (S.D. Cal. 2008) ........................................... 16

*Human Longevity, Inc. v. J. Craig Venter Inst., Inc.*,
   No. 18cv1656-WQH-LL, 2018 U.S. Dist. LEXIS 213912
   (S.D. Cal. Dec. 18, 2018).............................................................. 12

*IDX Systems Corp. v. Epic Systems Corp.*,
   285 F.3d 581 (7th Cir. 2002) .......................................................... 15

*Imax Corp. v. Cinema Technologies, Inc.*,
   152 F.3d 1161 (9th Cir. 1998) ............................................. 12, 13, 15

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
   No. 2:18-cv-10342-RGK-SK, 2019 U.S. Dist. LEXIS 109827
   (C.D. Cal. June 28, 2019) .............................................................. 15

*John M. Floyd & Assocs. v. First Imperial Credit Union*,
   No. 16-cv-1851 DMS (WVG),
   2017 U.S. Dist. LEXIS 177089 (S.D. Cal. Oct. 25, 2017)..................... 15

*Luxul Tech. Inc. v. NectarLux, LLC*,
   No. 14-CV-03656-LHK, 2016 U.S. Dist. LEXIS 78899 (N.D. Cal. June 16, 2016). 5

*Macro Niche Software, Inc. v. 4 Imaging Sols., L.L.C.*,
   Civil Action No. H-12-2293, 2013 U.S. Dist. LEXIS 194512
   (S.D. Tex. Dec. 18, 2013) ................................................................ 9

*MAI Sys. Corp. v. Peak Computer, Inc.*,
   991 F.2d 511 (9th Cir. 1993) .......................................................... 13

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
   602 F.3d 57 (2d Cir. 2010) .............................................................. 4

**DEFENDANTS' OPENING SUPPLEMENTAL BRIEF**
**CASE NO. 2:18-CV-01560-GW**

*QR Spex, Inc. v. Motorola, Inc.*,
   No. CV 03-6284-JFW (FMOx), 2004 U.S. Dist. LEXIS 27378
   (C.D. Cal. Oct. 28, 2004) ....................................................................... 10

*R.C. Olmstead, Inc., v. CU Interface, LLC*,
   606 F.3d 262 (6th Cir. 2010) ..................................................................... 8

*Rockwell Collins, Inc. v. Wallace*,
   No. SACV 17-1369-AG, 2017 WL 5502775 (C.D. Cal. Nov. 10, 2017) ............... 16

*Sas Inst. v. World Programming, Ltd.*,
   No. 5:10-CV-25-FL, 2012 U.S. Dist. LEXIS 165743
   (E.D.N.C. Oct. 18, 2012) ........................................................................... 3

*Shapiro, Bernstein & Co. v. 4636 S. Vermont Ave., Inc.*,
   367 F.2d 236 (9th Cir. 1966) ..................................................................... 5

*Shaw v. Lindheim*,
   809 F. Supp. 1393 (C.D. Cal. 1992) .......................................................... 9

*Thorner v. Sony Computer Entm't Am. L.L.C.*,
   669 F.3d 1362 (Fed. Cir. 2012) ................................................................. 21

*Topolos v. Caldewey*,
   698 F.2d 991 (9th Cir. 1983) ..................................................................... 5

*Ward v. Knox Cty. Bd. of Educ.*,
   No. 3:11-CV-438-TAV-CCS, 2014 WL 3368510
   (E.D. Tenn. July 9, 2014) ........................................................................... 3

*Wolstenholme v. Hirst*,
   271 F. Supp. 3d 625 ............................................................................... 7, 8

*X6D Limited v. Li-Tek Corps. Co.*,
   No. 10-cv-2327-GHK-PJWx, 2021 WL 12952726
   (C.D. Cal. Aug. 27, 2012) ......................................................................... 14

*XpertUniverse Inc. v. Cisco Sys.*,
   597 F. App'x 630 (Fed. Cir. 2015) ............................................................ 13

**STATUTES**

17 U.S.C. § 412(2) ..................................................................................... 4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OTHER AUTHORITIES**

1 Milgrim on Trade Secrets § 1.01 (2019) ...................................................................11

**RULES**

Fed. R. Civ. P. 37(c)(1)...............................................................................................2

Pursuant to the Court's Orders (D.I. 385, 391), Defendants and Counter-Claimants Directed Electronics Canada Inc., DEI Holdings, Inc., Directed, LLC, Jim Minarik, Kevin Duffy, Robert Struble, Tarek Kutrieh, and Minas Minassian (collectively, "Defendants") respectfully submit this Supplemental Briefing in Support of Defendants' summary judgment briefing.

## I.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NO COPYRIGHT INFRINGEMENT (D.I. 207)

### A.   Introduction

Plaintiff Automotive Data Solutions, Inc. ("ADS") never identified a copyright infringement theory with respect to its bootloader. Yet, for the first time, after summary judgement tentative rulings issued, ADS now shifts course and offers a bootloader copyright infringement theory with no expert testimony and no evidence supporting infringement.  ADS's experts Robert Zeidman and Peter Hess only offer, respectively, copyright infringement and damages opinions regarding the "structure, sequence, and organization" of the firmware for three ADS immobilizer bypass solutions: Honda, Mazda, and Subaru.  Defendants sought, and the Court has tentatively granted, summary judgment with respect to these allegations. (D.I. 207, 386.)

The Court's tentative order noted: "*To the extent that ADS is asserting a claim for infringement of a copyright* in its 'bootloader,' the Court would deny summary judgment on that claim..." (D.I. 386 at 6 (italics added); *see also id*. at 11 (similar statement).) However, summary judgment is proper because ADS made no bonafide claim of copyright infringement with respect to its bootloader. During the course of fact and expert discovery, ADS failed to identify any evidence or expert testimony to support a bootloader copyright infringement claim. Counsel for ADS also admits ADS seeks no damages for a bootloader copyright infringement claim. Simply put, ADS never put forth a claim for copyright infringement in any form for the bootloader.

Further, as with the Honda, Mazda, and Subaru solutions, ADS cannot show it owns an original valid copyright in its bootloader. ADS admits that its bootloader is

unregistered and a derivative work based on a bootloader created by a third party that ADS claims to license. Nonetheless, ADS has never identified or produced this license agreement. Nor has ADS produced the original bootloader code. ADS therefore cannot show that any purported modifications it made to a work created by a third party are original or even distinct from the third party's work. And even if it could, ADS has not shown that Defendants copied that distinct creation rather than the work created by the third party.  Here, in a competitor case, after two years of litigation and after the close of fact discovery, ADS should not be permitted to use its unregistered purported copyrights as a moving target. The Court should dispose of ADS's copyright cause of action in its entirety.

### B.    Argument

#### 1.    ADS Never Offered Necessary Expert Testimony to Support a Claim of Copyright Infringement With Respect to ADS's Bootloader.

There was a good reason why Defendants' copyright summary judgment motion did not focus on the "bootloader" – ADS has no evidence or expert testimony to support such a claim.  Namely, unlike the Mazda, Honda, and Subaru solutions for which Mr. Zeidman (ADS's technical expert) does offer an opinion, Mr. Zeidman flatly admitted that he did not render an opinion with respect to copyright infringement of ADS's bootloader:



(Moore Decl. Ex. 2, (D.I. 207-5) (Zeidman Tr.) at 180:14-17.)[1] Mr. Zeidman only opines on copyright infringement with respect to aspects of firmware for three ADS

---

[1] Any attempt by Mr. Zeidman or ADS to raise a bootloader copyright theory for the first time in the context of the tutorial following summary judgment briefing must be rejected.  This argument is contrary to Mr. Zeidman's aforementioned testimony and unsupported by Mr. Zeidman's 89-page expert report.  *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a

immobilizer bypass solutions—Honda, Mazda, and Subaru.  (Moore Decl., Ex. 1 (D.I. 207-6) (Zeidman Depo. Ex. 3); *see also*, Moore Decl. Ex. 2, Zeidman Tr. at 118:23-119:11 (confirming the chart's accuracy).) (SUF 1, 2.)  ADS should not now be permitted to advance a new copyright infringement theory, for which it has offered no expert opinion, in a complex computer code case, that is well beyond the knowledge of an ordinary juror. *See e.g. Ward v. Knox Cty. Bd. of Educ.*, No. 3:11-CV-438-TAV-CCS, 2014 WL 3368510, at *13-14 (E.D. Tenn. July 9, 2014) (granting summary judgment with respect to a copyright infringement claim where the expert did not opine that the infringing work was similar); *see also Cyberiansoft v. M.M. Primas Group Inc.*, No. SACV0801019JVSMLGX 2010 WL 11507802 at *7 (C.D. Cal. Dec. 22, 2010) ("Indeed, given the technical nature of the source codes, expert testimony is necessary to determine whether the codes are substantially similar.").

The lack of expert testimony in this complex computer code case is particularly troubling because ADS never even produced the underlying third-party bootloader code that forms the backbone of ADS's current bootloader.  (*See* Section II.B.2.b. infra; *see also* Moore Decl., Ex. 3, (D.I. 207-6) at 9 ("ADS's bootloader is derived from a licensed bootloader originally written by a third party in 2005").)  Ninth Circuit case law requires that "unprotectable elements" in an allegedly copyrighted work "be identified, or filtered," (here the elements from the original third party bootloader code) before the work and the alleged copy can be compared.  *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994); *see also Sas Inst. v. World Programming, Ltd.*, No. 5:10-CV-25-FL, 2012 U.S. Dist. LEXIS 165743, at *20 (E.D.N.C. Oct. 18, 2012) ("The Second Circuit itself has cited Computer Associates for the proposition that there are cases in which the question of substantial similarity—which, as in that case, can include the issue of protectability of nonliteral elements of the allegedly infringed program—

---

motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

1  cannot be addressed without the aid of discovery or expert testimony.") (citing *Peter F.*

2  *Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 65 (2d Cir. 2010)).

3      Given the lack of technical expert opinion and underlying code, it's not surprising

4  that ADS also makes no damages claim with respect to copyright infringement of its

5  bootloader. Just like Mr. Zeidman, Mr. Hess's copyright damages opinion is *only* based

6  on the three solutions for which ADS claims copyright infringement: Honda, Mazda,

7  and Subaru. (Brigham Decl., Ex. 1 (D.I. 205-2), ("Hess Rpt.") ¶¶ 24

8

9

10

11

12

13                                                                    In addition to

14  the lack of an expert damages opinion regarding the bootloader copyright infringement

15  claim, there have not been any fact witnesses disclosed as having relevant financial

16  knowledge about the bootloader.  Further, and even more importantly, ADS's counsel

17  agrees ADS is not entitled to damages for alleged copyright infringement of ADS's

18  bootloader. (*See* D.I. 387, Motion for Summary Judgment Hearing Transcript at 39:22-

19  23

20        .").)[2]

21      Without a technical or damages opinion with respect to any claim of copyright

22  infringement of ADS's bootloader, summary judgment is required. *See e.g. Luxul Tech.*

23  *Inc. v. NectarLux, LLC*, No. 14-CV-03656-LHK, 2016 U.S. Dist. LEXIS 78899, at *42

24  ───────────────

25  [2] Here, ADS does not seek, and indeed cannot seek, statutory damages as it did not
   reg

26

27                    9 (9th Cir. 2008). ("Section 412(2) mandates that, in order to recover
   statutory damages, the copyright work must have been registered prior to

28  commencement of the infringement, unless the registration is made within three months
   after first publication of the work.") (internal citation omitted).

(N.D. Cal. June 16, 2016) (granting summary judgment where the expert report contained "no calculation of damages for copyright infringement, and no other calculation of copyright damages ha[d] been identified."); *Shapiro, Bernstein & Co. v. 4636 S. Vermont Ave., Inc*., 367 F.2d 236, 241 (9th Cir. 1966) (a copyright plaintiff who failed to produce evidence of damages could not complain when the trial court found no damages were proved).

## 2. No Factual Evidence Supports a Copyright Infringement Claim with Respect to ADS's Bootloader.

Even if technical and damages expert testimony was deemed unnecessary, ADS still must have the predicate facts to support a claim for copyright infringement. Yet, ADS has failed to identify rudimentary elements of a copyright infringement claim with respect to its bootloader:

- ADS has failed to articulate exactly what it *owns* – *i.e.* what is ADS's copyright, rather than the copyright of the third-party it licensed it from.
- ADS has never identified evidence or opinion showing its bootloader copyright is directed at *original* subject matter.
- ADS has never identified what the allegedly infringing work is for which a substantial similarity comparison should be performed.

Now, at the summary judgment stage, is too late to do so.

### a. ADS Cannot Show Ownership of Its Alleged Bootloader Copyright.

Even if ADS somehow preserved a theory of copyright infringement with respect to its bootloader, ADS cannot show it owns an alleged copyright in the bootloader. "Ownership of the copyright is ... always a threshold question." *Topolos v. Caldewey*, 698 F.2d 991, 994 (9th Cir. 1983). Registration may not be a requirement under Canadian law, but it still serves as a practical and important evidentiary building block. Put simply, it answers the question that ADS has repeatedly had trouble answering in this case – "What is your copyright?" Instead, ADS has tried to use its decision not to

1    register to its advantage, manipulating its alleged "copyright" like a piece of silly putty
2    to cover whatever it deems infringing.

3         As the Court has noted (D.I. 386 at 7), under Canadian copyright law, "as a
4    general rule, the author of a work is the first owner of copyright." *CCH Can. Ltd.* v.
5    *Law Soc. of Upper Can.,* 1999 CarswellNat 2123, r126 (Can.) (reversed on other
6    grounds by *CCH Can. Ltd.* v *Law Soc. of Upper Can.,* 2002 CAD 187, 2002 FCA 187
7    (Can.)).[3] Under Canadian law, an entity must have direct authorship, or authority from
8    the author, to claim copyright ownership.  R.S.C. 1985, c. C-42, § 13(1) ("the author of
9    a work shall be the first owner of the copyright therein"); *id.* § 13(3)-(7) (providing for
10   ownership by employment, assignment, or license). Plaintiff bears the burden of
11   proving ownership of a valid copyright. *See Fleisher Studios, Inc. v. A. VE.L.A., Inc.,*
12   654 F.3d 958, 962 (9th Cir. 2011).[4]  This is particularly important here, where ADS
13   admits its bootloader is derived from a licensed bootloader written by a third party (*See*
14   *e.g.* Moore Decl., Ex. 3 (ADS's Response to Interrogatory No. 3) at pp. 9-10 ("ADS's
15   bootloader is derived from a licensed bootloader originally written by a third party in
16   2005 ('2005 bootloader'). ADS obtained a license for the 2005 bootloader from the
17   third party to create a derivative work. The 2005 bootloader was created by Independent
18   Security Evaluators in 2005 by Adam Stubblefield.").)

19        In spite of these claims, ADS never provided evidence, including a copy of the
20   bootloader license agreement, to support its ownership claims. ADS also did not
21   identify any license agreement in its response to DEI's Interrogatory seeking ADS's

---

22

[3] "The Copyright Act provides for one general exception: if the author created the work
23   during the course of his or her employment, the employer is the first owner of
     copyright." *Id*.
24   [4] The burden only "shifts to the defendant ... to prove the invalidity of the plaintiff's
     copyright" *only when* the plaintiff presents a certificate of registration of copyright
25   which entitles the holder to a "rebuttable presumption" of validity—which ADS admits
     it did not do.  (SAC ¶ 89; *Alaska Stock, LLC v. Pearson Educ., Inc.,* 975 F. Supp.2d
26   1027 (D. Alaska 2013).); Nimmer on Copyright § 7.16 (2019) ("[T]he benefits to
     foreigners of avoiding United States registration—saving a few dollars as well as some
27   logistical headaches—are meager, whereas the costs associated with that course of
     action—notably, giving up attorney's fees, statutory damages, and the prima facie
28   presumption of copyright validity—are comparatively massive.").

**DEFENDANTS' OPENING SUPPLEMENTAL BRIEF**
                                    **CASE NO. 2:18-CV-01560-GW**

contention on copyright ownership.  (Moore Decl., Ex. 3 at 12-13.) (SUF 6-7.)[5]  It is therefore unclear the legal terms under which the third-party, and later ADS employees, created the work. Of particular importance, ADS provides no evidence to show it has consent of the original author to create derivative works, as required by Canadian law. McKeown, FOX ON CANADIAN LAW OF COPYRIGHT AND INDUSTRIAL DESIGNS § 4:5. ("[S]ince the exclusive rights, which include the rights to make derivative works, are vested in the author, another individual who wishes to make a 'derivative' work will require the consent of the author."); *see also, Compo Co. v. Blue Crest Music, Inc.*, 1979 CarswellNat 640 ¶ 28 (Can.) ("[n]o unauthorized exercise of the owner's . . . rights in a work can produce in the wrongdoer a copyright in the resultant" work.).  It is further unclear whether ADS has the authority to own derivative works under the unseen license agreement.  This failure to identify evidence of ownership, a threshold issue for which ADS bears the burden, merits summary judgment as a matter of law.

### b.  ADS Cannot Show Originality of Its Alleged Bootloader Copyright.

Not only does ADS fail to show ownership of a copyright in its bootloader, it cannot show the bootloader copyright is original.  Canadian copyright law "protects only original expression," not "the idea underlying the *expression*."  *Andrews v. McHale*, 2016 FC 624, 141 C.P.R. (4th) 407, ¶ 86; see also *Wolstenholme v. Hirst*, 271 F. Supp. 3d 625, 640 (citing CCH, 1 S.C.R. 339, ¶ 22) ("[I]n Canada, as in the United States, copyright protection does not extend to facts or ideas, but is limited to the expression of ideas.").  Therefore, "skill and judgment" alone do not lead to copyright protection, as "intellectual effort" that "fall[s] into the category of ideas, methods, procedures, algorithms or other categories of contributions which, while perhaps

---

[5] Defendants had specifically requested that ADS respond to Interrogatory No. 4 beginning on March 11, 2019.  (Moore Exs. 4 (D.I. 207-7) (March 11, 2019 letter), 5 (D.I. 207-8) (March 19, 2019 letter), 6 (D.I. 207-9) (May 10, 2019 email), 7 (D.I. 207-10) (May 20, 2019 email).) (SUF 5.)

1    valuable, fall outside … copyright law." *Andrews*, 2016 FC 624, ¶ 88.

2        ADS's response to Interrogatory No. 3 provides conclusory descriptions of its

3    bootloader copyright and unsupported claims regarding its supposed originality. (Moore

4    Decl., Ex. 3.) Yet, without the license, it is not possible to know the scope of the original

5    work from which ADS claims its bootloader was derived. ADS also did not produce the

6    original bootloader code. It is therefore not possible to know what ADS claims is its

7    original derivative work or even what ADS added to the work, especially absent expert

8    testimony—which is the case here. *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d

9    262, 272 (6th Cir. 2010) ("Neither Reid's report nor his additional declaration makes

10   any attempt to identify those elements of the Olmstead software that are *unique* and

11   *original*, rather than necessary to the *function* of any credit union software." (emphases

12   added).)  Absent identifying the original, third-party bootloader code, ADS cannot

13   demonstrate that the material for which it claims copyright protection is "original" in

14   comparison. *See e.g. Wolstenholme*, 271 F. Supp. 3d at 639 (holding that Canadian

15   copyright law requires a plaintiff to show its work is original).

16           **c.    ADS Cannot Show Copying of Its Alleged Bootloader**
17                   **Copyright.**

18       Finally, even if ADS could show ownership and originality, it has not shown that

19   the piece of "original" code that it owns was copied. *R.C. Olmstead, Inc.* 606 F.3d at

20   275 ("Because Olmstead has failed to produce evidence creating a question of fact as

21   to whether CUI copied original elements of its software, CUI was entitled to summary

22   judgment on Olmstead's copyright infringement claims.").  Contrary to the Court's

23   tentative order on Defendants' Motion for Summary Judgment of No Alleged Trade

24   Secret Misappropriation, ADS does not claim "Defendants…develop[ed] the DEI

25   bootloader from ADS's bootloader technology." (D.I. 385 at 9; *see also* Moore Decl.,

26   Ex. A (Tech Tutorial Transcript) at 78:21-25 ("

27

28           .") Nor could they. ADS's bootloader is specifically adapted to its microchip

**DEFENDANTS' OPENING SUPPLEMENTAL BRIEF**
                                                      **CASE NO. 2:18-CV-01560-GW**

1  and the microprocessor embedded in that chip (*See e.g.* Moore Decl., Ex. 3 ("ADS's

2  employees in Canada created derivative works from the 2005 bootloader by adapting

3  and modifying it to be compatible with new microchips.").) DEI's products ███

4  ████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████ [6]

6  Therefore, ADS admits "[█████████████████████████████████████████."

7  (D.I. 251 at 10.)   And again, since Mr. Zeidman offered no opinion on copyright

8  infringement for the bootloader, ADS has waived any ability to perform any comparison

9  between pieces of source code now.  *See Antonick v. Elec. Arts, Inc*., 841 F.3d 1062,

10  1066 (9th Cir. 2016) (holding a source code comparison must be made to determine

11  substantial similarity); *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003)

12  (holding plaintiff's "failure to adduce evidence to allow a comparison between the

13  [copyrighted source code] and the allegedly infringing program vitiates his claim.");

14  *see also Apple Comput., Inc.,* 35 F.3d at 1446 ("unprotectable elements have to be

15  identified, or filtered, before the works can be considered as a whole."); *Brocade

16  Communs. Sys. v. A10 Networks*, Inc., No. 10-CV-03428-LHK, 2011 U.S. Dist. LEXIS

17  91384, at *6 (N.D. Cal. Aug. 16, 2011) ("the Ninth Circuit has used an

18  'abstraction/filtration/comparison' test to help separate protectable and non-protectable

19  elements in the context of computer software."); *Shaw v. Lindheim*, 809 F. Supp. 1393,

20  1403 (C.D. Cal. 1992) ("substantial similarities between unprotected elements…cannot

21  be used to find substantial similarities in the protect[a]ble expression of two works.");

22  *Macro Niche Software, Inc. v. 4 Imaging Sols*., *L.L.C.*, Civil Action No. H-12-2293,

23  2013 U.S. Dist. LEXIS 194512, at *16-17 (S.D. Tex. Dec. 18, 2013) (Absent an

24  abstraction and filtration analysis, Defendants are entitled to summary judgment on the

---

[6] Moore Decl., Ex. 2 (Zeidman Tr.) at 111:22-112:6 ████████████████████

**DEFENDANTS' OPENING SUPPLEMENTAL BRIEF
CASE NO. 2:18-CV-01560-GW**

copyright claim.).

### C.   Conclusion

Absent expert testimony or evidence of infringement, ADS cannot now advance a new copyright theory based on inferences "drawn from thin air; [the inferences] must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *QR Spex, Inc. v. Motorola, Inc*., No. CV 03-6284-JFW (FMOx), 2004 U.S. Dist. LEXIS 27378, at *23-24 (C.D. Cal. Oct. 28, 2004) (internal citations omitted). To allow ADS to proceed to trial on a bootloader copyright infringement claim is contrary to *Celotex*. It would also be confusing to the jury and therefore highly prejudicial. This case involves complex cryptographic algorithms that are difficult for a jury understand. Yet, ADS seeks to proceed on a bootloader copyright based on attorney argument—without technical expert testimony, a damages opinion, or any supporting evidence.[7] Summary judgment is required.

## II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NO ALLEGED TRADE SECRET MISAPPROPRIATION (D.I. 217)

### A.   Introduction

Just like with its alleged copyrights, ADS must show it owns the alleged trade secrets it now asserts.  As the Court and all the parties noted, there is no dispute that ADS and DEI reverse engineer OEM vehicle software to obtain the relevant immobilizer algorithms and that ADS's alleged trade secrets are derived directly from the OEM code. However, ADS has not shown it has a rightful legal interest in any OEM information contained in its alleged trade secrets.  Specifically, ADS cannot identify

---

[7] As the Court noted at the summary judgment hearing, for ADS to proceed on both a copyright and trade secret claim with respect to its bootloader at trial would be confusing and antithetical. (D.I. 387 at 46:17-2 ("The problem is to attempt to use copyright in the context of a trade secret is antithetical, there is a difference. Trade secret is keeping something secret. Copyright is you exposed it and people are copying it."); *see also* SAC ¶ 84 ("The copyrighted software of the Bootloader was first published and distributed via sales of ADS modules beginning in or about 2006 in Canada.").

what exactly are its trade secrets in the specific vehicle codes at issue and whether and how they differ from the original OEM code.

Original OEM code was never produced let alone analyzed in this case—a fatal flaw that ADS attempts to obscure.  ADS identifies several lines of code from firmware for its Subaru, General Motors, Toyota, Nissan, and Chrysler solutions that it alleges are trade secrets, but the analysis rests on a missing foundation.  Without OEM original code, ADS cannot identify different, let alone valuable, subject matter that is protectable as trade secrets.  In simple terms, ADS cannot differentiate any of its alleged trade secrets, obtained through reverse engineering of OEM solutions, from general knowledge in the trade or special knowledge of those skilled in the trade. This failure to identify the alleged trade secrets ADS claims to own with requisite particularity requires summary judgment. Further, without identification of its alleged trade secrets ADS cannot show those alleged trade secrets derive economic value from not being generally known. The Court should therefore grant summary judgment in favor of DEI with respect to ADS's federal and state trade secret misappropriation claims.[8]

### B.   Can an entity have valid ownership of a "trade secret" that resulted from reverse engineering of another company's source code?

Defendants agree that an entity *could* own a trade secret that results from reverse engineering.  *See* 1 Milgrim on Trade Secrets § 1.01 (2019) (citing to Legis. Comm. com. to Civ. Code, § 3426.1).  This possibility raises two important points with respect to Defendants' summary judgment motion.

*First,* that trade secrets may be lawfully obtained from reverse engineering, underscores that reverse engineering is not improper means. *See e.g. DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 901 n.5, (2003) ("[I]f trade secret law did allow alleged trade secret holders to redefine 'improper means' to include reverse engineering, it would likely be preempted by federal patent law, which alone grants

---

[8] DEI responds to the questions posed by the Court regarding ownership in turn. (D.I. 386.)

**DEFENDANTS' OPENING SUPPLEMENTAL BRIEF**
**CASE NO. 2:18-CV-01560-GW**

1  universal protection for a limited time against the right to reverse engineer.") (citing
2  *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.* 489 U.S. 141, 155 (1989)); *see also*
3  *Chi. Lock Co. v. Fanberg*, 676 F.2d 400, 404 (9th Cir. 1982) ("It is well recognized that
4  a trade secret does not offer protection against discovery by fair and honest means such
5  as by independent invention, accidental disclosure or by so-called reverse engineering,
6  that is, starting with the known product and working backward to divine the process.")
7  (internal citations omitted).

8        *Second,* ADS cannot claim on the one hand that its reverse engineering efforts
9  are proper and the results are entitled to trade secret protection, yet at the same time
10  argue that those same techniques (*e.g.* decapping, de-compiling, etc.) are "improper
11  means" when done by Defendants.  Fundamentally, each player in the industry must
12  reverse engineer to obtain the solution to each OEM algorithm that secures a car.[9]  ADS
13  cannot have it both ways. Either ADS impermissibly obtained the material over which
14  it now claims trade secret protection, or those same actions when performed by DEI are
15  not improper means.

16        **C.    If so, must the technology or codes be materially different?**

17        Yes, the code must be different and ADS must be able to differentiate any trade
18  secrets obtained through reverse engineering from general knowledge in the trade or
19  special knowledge of those skilled in the trade.  *See Human Longevity, Inc. v. J. Craig*
20  *Venter Inst., Inc.,* No. 18cv1656-WQH-LL, 2018 U.S. Dist. LEXIS 213912, at *10
21  (S.D. Cal. Dec. 18, 2018) ("The alleged trade secret must be described with sufficient
22  particularity to distinguish it from matters generally known in the trade or specially
23  known to persons skilled in the trade, and to enable the defendant to ascertain the
24  boundaries of the trade secret.") (citing *Imax Corp. v. Cinema Technologies, Inc*., 152
25  F.3d 1161, 1164-65 (9th Cir. 1998)).  As Defendants set forth in the summary judgment

26
9
27  ████████████████████████████████████████████████
28  ████████████████████████████████████████

briefing, oral argument, and tutorial, ADS has not and cannot make this showing without the original OEM code.

Fundamentally, "[a] plaintiff seeking relief for misappropriation of trade secrets 'must identify the trade secrets and carry the burden of showing that they exist.'" *Imax*, 152 F.3d at 1164 (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993)). To meet this burden, Plaintiff must "describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." *Id*. at 1164-65 (internal citations omitted) (emphasis in original); *see also XpertUniverse Inc. v. Cisco Sys.*, 597 F. App'x 630, 640 (Fed. Cir. 2015) (citing *Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.*, 226 Cal. App. 4th 26, 43-44 (2014) for the same proposition). "When a party fails to identify its trade secrets with particularity, summary judgment is appropriate*." Freeman Inv. Mgmt. Co., LLC v. Frank Russell Co.*, No. 13-CV-2856 JLS (RBB), 2016 U.S. Dist. LEXIS 136220, at *27 (S.D. Cal. Sep. 30, 2016) (citing *Imax*, 152 F.3d at 1166) (internal citations omitted).

Here, ADS must differentiate the alleged trade secrets obtained through reverse engineering[10]—certain aspects of its General Motors, Toyota, Nissan, Chrysler, and Subaru immobilizer bypass solutions—from information generally known in the aftermarket remote start industry, or information specifically known to persons skilled in the industry such as other industry participants or car manufacturers. *Imax*, 152 F.3d at 1164-65.  Car makers specifically know the one solution to each OEM algorithm that secures a car. (Moore Decl., Ex. 7 (D.I. 219-11) (Zeidman Tr.) at  71:19-22 (SUF 10) ("Q.                                                                                                                                                              ."); *see also* n. 9 *supra*.)[11]

---

[10] Mr. Zeidman agrees the immobilizer bypass solutions for which ADS now claims trade secret protection were developed through reverse engineering of OEM vehicles. (Moore Decl., Ex. 7 (Zeidman Tr. at 69:22-70:7) (SUF 14, 15).)
[11] Moore Decl., Ex. 10 (D.I. 219-6) (SUF 11-13).

DEI and ADS must reverse engineer cars to obtain the *same* solution to the *same* OEM algorithm for their solutions to work.[12]  Carmakers and industry participants also generally know common examples of different cryptographic algorithms used in immobilizer bypass solutions, such as the Hitag-2 algorithm. (Andrews Decl., Ex. 1 (D.I. 290-4) (Andrews Rebuttal Rpt. ¶¶ 91; 115 ███████████████████████████████████████████████████.”); *see also* Moore Decl., Ex. A (Tech Tutorial Transcript) at 35:3-36:14).)[13]  In fact, ████████████████████████████████████████████████████.” (Andrews Rebuttal Rpt. at ¶ 262.)

ADS cannot differentiate this information specifically known by the OEM and/or generally known in the industry (e.g., Hitag-2 algorithm) from its alleged trade secrets.  The evidence necessary to make such a showing was never produced during discovery:  ADS never produced the original OEM code.[14]   ADS's expert Mr. Zeidman also confirmed he made no comparison between ADS's Subaru, General Motors, Toyota, Nissan, and Chrysler alleged trade secrets and the OEM code.[15]   ADS therefore does not identify the bounds of its ownership interest with requisite particularity. *See X6D Limited v. Li-Tek Corps. Co.*, No. 10-cv-2327-GHK-PJWx, 2021 WL 12952726, at *6 (C.D. Cal. Aug. 27, 2012) ("[A] plaintiff must do more than just identify a kind of

---

[12] Moore Decl., Ex. 7 (D.I. 219-10) (SUF 14-15.).

[13] " ████████████████████████████████████████████████████████████████████.” (Andrews Decl., Ex. 1 (D.I. 290-4) (Andrews Rebuttal Rpt. ¶ 96).) ██████████████. *Id*. at ¶¶ 91, 115. 47:25-53:15 (Mr. Andrew's (DEI's expert) testimony regarding the difference between original OEM binaries and C code and ADS's C code representation of that in

[15] █████████████████████████████████████████

technology and then invite the court to hunt through the details in search of items meeting the statutory definition of [a trade secret.]") (internal citation omitted).

In sum, ADS cannot make the distinction required by *Imax*. Without the original OEM code, ADS cannot differentiate the alleged trade secrets it obtained through reverse engineering from general knowledge in the trade or special knowledge of those skilled in the trade with requisite particularity. Fundamentally, ADS cannot claim to own what it cannot identify. Summary judgment is required with respect to ADS's alleged General Motors, Toyota, Nissan, Chrysler, and Subaru alleged trade secrets. *See, e.g., InteliClear, LLC v. ETC Glob. Holdings, Inc.*, No. 2:18-cv-10342-RGK-SK, 2019 U.S. Dist. LEXIS 109827, at *11-12 (C.D. Cal. June 28, 2019) (granting summary judgment where "[n]either the Court nor Defendant can ascertain which specific elements Defendant is accused of misappropriating. Plaintiff has therefore not met its burden to 'describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade.'") (citing *Imax Corp.*, 152 F.3d at 1164-65); *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581, 584-85 (7th Cir. 2002) (finding the description of methods and processes underlying software package features was not sufficiently specific because plaintiff did not distinguish the alleged trade secrets from elements in the software "known to the trade.") (cited by *InteliClear, LLC*, 2019 U.S. Dist. LEXIS 109827, at *8-9); *John M. Floyd & Assocs. v. First Imperial Credit Union*, No. 16-cv-1851 DMS (WVG), 2017 U.S. Dist. LEXIS 177089, at *11-12 (S.D. Cal. Oct. 25, 2017) (granting summary judgment where Plaintiff's "generalizations" regarding elements of its alleged trade secrets were insufficient to "establish the necessary distinctions between its proprietary information and general knowledge in the trade").

### D.   If so, to what extent must the technology over which the trade secret is asserted be different than the original technology?

Not only must ADS be able to differentiate any alleged trade secrets obtained through reverse engineering from general and special knowledge in the trade, ADS must

also show that difference is such that ADS *derives economic value* from its alleged trade secrets not being generally known.[16] ADS cannot make this showing.

For the reasons discussed in Section II.C above, ADS does not identify its alleged trade secrets with the requisite particularity. Without this identification, ADS cannot assign value to those alleged trade secrets. Nor can ADS show that it derives economic value from the alleged trade secrets not being known, in particular because it is not clear what parts of ADS's alleged trade secrets are generally or specifically known by carmakers or other industry participants. *See e.g.*, *Hilderman v. Enea TekSci, Inc*., 551 F. Supp. 2d 1183, 1199 (S.D. Cal. 2008) (finding Plaintiff failed to raise a triable issue of material fact with respect to whether its alleged trade secrets derived independent economic value from not being generally known in the industry).

Further, even if ADS did make the requisite showing, ADS's damages expert never assigns value to the narrow aspects of ADS's solutions over which ADS claims trade secret protection. For example, with respect to the Subaru solution, ADS claims it "organized the loops in the algorithm and obfuscated the code at a unique point by splitting it between the in-vehicle module and the KLON server." (D.I. 251-1.) Yet, ADS makes no attempt to show that ADS "derives economic value" from purportedly organizing the loops in the original OEM algorithm, or from any other narrow functional aspect of its immobilizer bypass solutions that ADS claims Defendants misappropriated. Instead, ADS's damages expert Dr. Hess, as discussed in Defendants' *Daubert* motion (D.I. 205), only calculates unjust enrichment and lost profit damages using three "levels" or categories: (

---

[16] "Both the DTSA and the CUTSA define a trade secret as information that (1) derives its economic value from not being generally known, and (2) is subject to reasonable measures of secrecy by its owner." *Rockwell Collins, Inc. v. Wallace*, No. SACV 17-1369-AG, 2017 WL 5502775, at *2 (C.D. Cal. Nov. 10, 2017).

1  ███████, and therefore does not tie his damages calculation to the actual scope of the

2  alleged misappropriation which is significantly narrower.  Dr. Hess's high-level

3  analysis not only merits exclusion for the reasons set forth in DEI's *Daubert* motion, it

4  also fails to identify the economic value of any esoteric elements of the immobilizer

5  bypass solutions that ADS now alleges that DEI misappropriated.

6      **E.**    **Conclusion**

7      For the foregoing reasons, Defendants respectfully Request that the Court grant

8  Defendants' motion for summary judgment of no federal or state trade secret

9  misappropriation.

10  **III.**    **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON PATENT
11  CLAIMS (D.I. 213)**

12      The Court's tentative order related to Plaintiff's Motion for Summary Judgment

13  on Patent Claims (D.I. 213) ordered the parties to submit supplemental briefing

14  regarding claim construction of certain terms in Defendants' '185 and '400 patents.

15  (D.I. 384, Minute Order re Plaintiff's Motion for Summary Judgment on Patent Claims.)

16  For the reasons below, Defendants propose the following claim constructions for these

17  terms.

18      **A.**    **Claim Construction of Term from '185 Patent**

| Claim Term | Court's Prior Construction | Defendants' Proposed Construction |
|---|---|---|
| "detect a first pulsed voltage pattern and a second pulsed voltage pattern . . . the second pulsed voltage pattern having a higher frequency than the first pulsed voltage pattern" (all asserted claims of the '185 patent) | Court declined to construe | "**determine the presence of** a first pulsed voltage pattern and a second pulsed voltage pattern . . . the second pulsed voltage pattern having a higher frequency than the first pulsed voltage pattern" |

    The Court should construe "detect a first pulsed voltage pattern and a second

pulsed voltage pattern" to mean "**determine the presence of** a first pulsed voltage pattern and a second pulsed voltage pattern." Inclusion of the phrase "determine the presence of" is consistent with the claim language, which recites that the purpose of detecting voltage patterns is to "signal the disengagement of the starter from the flywheel after a detection of the termination of the first pulsed voltage pattern and the start of the second pulsed voltage pattern." ('185 patent at claim 1.) There are no claim limitations that impose any requirements regarding how the patterns are detected or what frequencies are associated with the patterns. ('185 patent at claims 1–16.) The specification makes it clear that the step of "detecting the battery voltage" involves "*determining* whether the end of the [first] pulsed voltage [pattern] has been detected" and whether "the second pulsed voltage [pattern] is detected." (*Id.* at 10:11–17 (emphasis added).) Nothing more is required.

The proper construction of this term is important because ADS erroneously argues that its products do not infringe the '185 patent because they allegedly do not (1) "detect" a first pulsed voltage pattern or a second pulsed voltage pattern or (2) compare the frequencies of the voltage patterns. (D.I. 216 at 14–15.) In support of its first argument—that its products do not detect voltage patterns—ADS misleadingly argues that a product that " ████████████████████████████████████████ ████████████████████████████████████████ ) can *never* "detect" the presence of voltage patterns. ADS argues that patterns cannot be discerned unless voltage is constantly monitored. Nothing in the intrinsic record defines or limits "detecting" to continuous monitoring of battery voltage.[17] To the contrary, one embodiment of the invention described in the specification includes a "pulse monitoring circuit" that samples *an entire voltage pattern* before sending it to a "processor," which "perform[s]

---

[17] The Court has already held in its claim construction order (and again in its tentative decision on this issue) that "the intrinsic record does not require that the monitoring circuit be constantly/continuously monitoring" battery voltage. (D.I. 93 at 11; D.I. 384 at 10.) For the reasons already considered by the Court in its prior orders, the claims do not require that voltage be continuously monitored.

1   a comparison of the detected pattern with voltage pattern values stored in memory."
2   ('185 patent at 10:47–11:4.)  In other words, no "detect[ion]" takes place in this
3   embodiment until *the entire voltage pattern has already been captured*.  This is far from
4   "continuous" voltage measurement.[18]

5        Regarding ADS's second argument, the Court correctly noted in its order that
6   "[t]he claim language does not require that the monitoring circuit 'directly measure a
7   frequency,'" "[i]t simply requires detecting two 'voltage *pattern[s]*,' where those
8   voltage patterns '*hav[e]*' certain frequencies."  (D.I. 384 at 11.)  Likewise, nothing in
9   the specification or file history requires direct measurement of frequency.  The patent
10  describes the first and second pulsed voltage patterns as natural phenomena associated
11  with the starting of a vehicle's engine—the first pattern associated with the vehicle's
12  (slower-rotating) *starter* motor and the second associated with the vehicle's *engine*.
13  ('185 patent at 9:50–63.)  There is no reason why detection of the (already-known)
14  frequencies of these patterns would be necessary or even helpful.  The patent is only
15  interested in determining when the engine has started (i.e., determining when the second
16  pulsed voltage pattern associated with the engine starting has been detected).

17       As a result, Defendants' proposed construction, which is the most consistent with
18  the intrinsic record, would be the most helpful to a jury in making its infringement and
19  invalidity determinations.

20
21
22
23
24
25  [18]
26  [redacted]
27
28

**B.     Claim Construction of Terms from '400 Patent**

| Claim Term | Court's Prior Construction | Defendants' Proposed Construction |
|---|---|---|
| "operative to transmit and receive data in [a] plurality of modulation modes" (all asserted claims of the '400 patent) | Not previously construed | "operative **at any time, including before selection of a modulation mode,** to transmit and receive data in [a] plurality of modulation modes" |
| "means . . . to select a selected modulation mode" (all asserted claims of the '400 patent) | <u>Function</u>: "selecting a selected modulation mode from among the plurality of modulation modes for exchange of data between said remote and mobile units"<br><br><u>Structure</u>: "a microprocessor, a microcontroller, or an application-specific integrated circuit."  ('400 patent at 6:31–45) | Same as the Court's prior construction (no proposed change) |

The Court should construe "operative to transmit and receive data in [a] plurality of modulation modes" as "operative **at any time, including before selection of a modulation mode,** to transmit and receive data in [a] plurality of modulation modes."

This construction is important because ADS has ignored Defendants' infringement argument for the '400 patent throughout summary judgment proceedings. As explained in Mr. Wilson's expert report, ADS's accused key fobs include firmware that *affirmatively selects* a modulation mode out of *multiple* available modulation modes.  (Wilson Decl., Ex. A, (D.I. 248-9) Wilson Open. Expert Report at ¶¶ 234–35.) Indeed, ADS does not dispute that its accused products are "operative to transmit and receive data in [a] plurality of modulation modes" *before* ADS's firmware selects a

1    particular modulation mode, as discussed in Mr. Wilson's report.  (*See generally* D.I.

2    216, 293.)  The Court has already construed the phrase "means . . . to select a selected

3    modulation mode" to have the structure of "a microprocessor, a microcontroller, or an

4    application-specific integrated circuit."  (D.I. 384 at 12.)  The patent describes these

5    alternative structures collectively as "baseband processor circuitry," which "operates a

6    *control program* which includes the vehicle operating functions and instructions for

7    *multiple modulation mode* operation, *selection* and data exchange."  ('400 patent at

8    6:29–39 (emphases added).)  In other words, the patent describes computer software or

9    firmware for selecting one of a plurality of modulation modes.  This is precisely what

10   Defendants have accused in ADS's products.  (*See* D.I. 248 at 24–25.)

11          Ignoring Mr. Wilson's report and Defendants' infringement contentions, ADS

12   misleadingly states that its accused products *as sold* are "incapable of transmitting,

13   receiving, and exchanging data in more than one modulation mode" (D.I. 216 at 23–

14   24), citing the conclusory and self-serving testimony of ADS's chief engineer (D.I. 216-

15   7 at 22 (SUF 71).)  The patent does not require the ability to *toggle* modulation modes

16   at will after products have been sold, as ADS suggests.  Instead, the patent only requires

17   *selection* (once) *at any time* of a modulation mode.  (*See* '400 patent at 7:6–9 ("Upon

18   receiving the appropriate selection signal from the baseband processor circuitry 62, the

19   transceiver circuitry 60 will function in the required AM or FM mode.").)  The ability

20   to select one of a plurality of modulation modes—even once—accomplishes the

21   patent's stated goal of allowing selection of the modulation type that "provides the best

22   reception" (*id.* at 5:55–57), which "allows for extensibility and upgradeability of

23   hardware functionality without having to change chipsets" based on the particular

24   geographic region or environment in which the key fobs will operate (Wilson Decl. Ex.

25   A, Wilson Open. Expert Report at ¶ 44).  Construing the claims to *exclude* single-

26   selection embodiments would improperly import limitations into the claims that are not

27   present in the intrinsic record.  *Thorner v. Sony Computer Entm't Am. L.L.C.*, 669 F.3d

28   1362, 1366 (Fed. Cir. 2012) ("We do not read limitations from the specification into

**DEFENDANTS' OPENING SUPPLEMENTAL BRIEF**
**CASE NO. 2:18-CV-01560-GW**

1  claims; we do not redefine words.   Only the patentee can do that.   To constitute

2  disclaimer, there must be a clear and unmistakable disclaimer.").

3  **C.   Conclusion**

4  For the foregoing reasons, the Court should construe the disputed limitations as

5  proposed by Defendants in Section III.A above, and deny ADS's motion for summary

6  judgment of non-infringement.

7

8  Dated: November 8, 2019                   Cooley LLP

9                                            */s/ Matthew J. Brigham*
                                             MATTHEW J. BRIGHAM (191428)
10                                           (mbrigham@cooley.com)
                                             SARAH B. MOORE (292974)
11                                           (smoore@cooley.com)
                                             3175 Hanover Street
12                                           Palo Alto, CA  94304-1130
                                             Telephone: (650) 843-5000
13                                           Facsimile:  (650) 849-7400

14                                           STEPHEN R. SMITH (*pro hac vice*)
                                             (stephen.smith@cooley.com)
15                                           SAMUEL K. WHITT (284770)
                                             (swhitt@cooley.com)
16                                           1299 Pennsylvania Avenue, NW, Suite 700
                                             Washington, DC  20004-2400
17                                           Telephone: (202) 842-7800
                                             Facsimile:  (202) 842-7899

18
19                                           REBECCA L. TARNEJA (293461)
                                             (rtarneja@cooley.com)
20                                           1333 2nd Street, Suite 400
                                             Santa Monica, CA  90401
21                                           Telephone: (310) 883-6400
                                             Facsimile:  (310) 883-6500

22                                           Attorneys for Defendants and
                                             Counterclaim-Plaintiffs
23                                           DIRECTED ELECTRONICS CANADA
                                             INC.; DEI HOLDINGS, INC. (AKA
24                                           DIRECTED ELECTRONICS, INC.);
                                             DIRECTED, LLC; JIM MINARIK;
25                                           KEVIN DUFFY; ROBERT STRUBLE;
                                             TAREK KUTRIEH; and MINAS
26                                           MINASSIAN

27

28

**DEFENDANTS' OPENING SUPPLEMENTAL BRIEF**
                                             **CASE NO. 2:18-CV-01560-GW**