1 R. Joseph Trojan, CA Bar No. 137,067
2 trojan@trojanlawoffices.com
  Dylan C. Dang, CA Bar No. 223,455
3 dang@trojanlawoffices.com
  Francis Wong, CA Bar No. 284,946
4 wong@trojanlawoffices.com
5 TROJAN LAW OFFICES
  9250 Wilshire Blvd., Suite 325
6 Beverly Hills, CA  90212
7 Telephone:   310-777-8399
  Facsimile:    310-777-8348
8 Attorneys for Plaintiff,
9 Automotive Data Solutions, Inc.

10

11 **UNITED STATES DISTRICT COURT**
12 **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

13

14 AUTOMOTIVE DATA                          CASE NO. 2:18-cv-1560-GW-E
   SOLUTIONS, INC., a Canada
15 Corporation,                            **PLAINTIFF'S SUPPLEMENTAL**
16         Plaintiff,                      **BRIEFING**

17     v.                                  **Hon. George H. Wu**

18 DIRECTED ELECTRONICS
   CANADA INC., a Canada                   Date: December 5, 2019
19 Corporation; DEI HOLDINGS, INC.         Time: 8:30 a.m.
   (AKA DIRECTED ELECTRONICS,             Courtroom: 9D
20 INC.), a Florida Corporation;
   DIRECTED, LLC, a Delaware LLC,
21 JIM MINARIK, an individual; KEVIN
   DUFFY, an individual; ROBERT
22 STRUBLE, an individual; TAREK
   KUTRIEH, an individual; MINAS
23 MINASSIAN, an individual,

24         Defendants.
   AND RELATED
25 COUNTERCLAIMS AND
   COUNTERCLAIMS-IN-REPLY

26

27

28

TROJAN LAW OFFICES
Beverly Hills

# Table of Contents

PAGE

I.   SUPPLEMENTAL BRIEFING REGARDING TRADE
     SECRET MISAPPROPRIATION ................................................................ 1

     A.   "Improper Means" .......................................................................... 1

          1.   "Improper Means" Are Means that Fall Below the
               Standard of "Commercial Morality" ........................................ 1

          2.   Defendants' Taking of the Bootloader Fell Below
               the Standard of Commercial Morality ...................................... 3

     B.   Trade Secret Can be Derived from OEM Sources ............................ 6

II.  SUPPLEMENTAL BRIEFING REGARDING THE '780
     PATENT ........................................................................................ 8

     A.   Supplemental Briefing on the Invention ........................................ 8

     B.   Supplemental Briefing on the "Computer Program"
          Limitations ................................................................................ 9

          1.   Key Data and Firmware Are Written to the Module ............... 10

          2.   That Key Data Includes Instructions Is Not a New
               Theory ................................................................................ 13

III. SUPPLEMENTAL BRIEFING REGARDING THE '185
     PATENT ........................................................................................ 13

     A.   Supplemental Briefing on the "Flywheel" Limitation ...................... 13

     B.   Supplemental Briefing on the Voltage Patterns and
          Frequency Limitations ................................................................ 15

          1.   Review of the '185 Patent's Disclosure ................................. 16

TROJAN LAW OFFICES
BEVERLY HILLS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2. Construction of "Voltage Pattern" and "Frequency" ............................................................................... 17

IV. SUPPLEMENTAL BRIEFING REGARDING THE '386 PATENT ................................................................................................ 20

V. SUPPLEMENTAL BRIEFING REGARDING THE '400 PATENT ................................................................................................ 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TROJAN LAW OFFICES
BEVERLY HILLS

# Table of Authorities

**Cases**                                                                    PAGE(S)

*E.I. duPont deNemours & Co. v. Christopher*,
    431 F.2d 1012 (5th Cir. 1970) ..................................................... 1-2, 5

*Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*,
    147 F.Supp.2d 1057 (D. Kan. 2001) ............................................... 7

*Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc.*,
    920 F.2d 171 (2d Cir. 1990) ............................................................ 6

*Kewanee Oil Co. v. Bicron Corp.*,
    416 U.S. 470, 94 S. Ct. 1879, 40 L. Ed. 2d 315 (1974) ................... 1

*Phillips v. Frey*,
    20 F.3d 623 (5th Cir. 1994) ............................................................ 2

*Pyro Spectaculars N., Inc. v. Souza*,
    861 F.Supp.2d 1079 (E.D. Cal. 2012) ......................................... 6-7

*Shapiro v. Hasbro Inc.*,
    No. 215CV02964BROAJW,
    2016 WL 9137526 (C.D. Cal. July 20, 2016) ................................. 2

*United States v. Nosal*,
    844 F.3d 1024 (9th Cir. 2016) ....................................................... 6

TROJAN LAW OFFICES
BEVERLY HILLS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Rules*                                                                    PAGE

Cal. Civ. Code § 3426.1 ........................................................... 2

Defend Trade Secret Act ....................................................... 1, 3


*Treatises*                                                                PAGE

*The New IEEE Standard Dictionary of Electrical and Electronics Terms* (Fifth Ed. 1993) ............................................................. 9

TROJAN LAW OFFICES
BEVERLY HILLS

Pursuant to the Court's October 24, 2019 Order (Dkt. #391), Plaintiff Automotive Data Solutions, Inc. ("ADS") respectfully submits the following supplemental briefing on issues relating to the parties' respective motions for summary judgment.

# I.   SUPPLEMENTAL BRIEFING REGARDING TRADE SECRET MISAPPROPRIATION

## A.   "Improper Means"

At the October 17 hearing, the Court asked: "[W]hat is the improper means that is utilized in this particular situation, decapping is decapping unless you tell me decapping is either illegal, per se, or it's illegal in the industry, then I can understand something of that sort." (Trojan Decl., Ex. 1: SJ Hearing Tr. at 39:4-8.)  To answer this question, ADS presents supplemental briefing on the legal standard for "improper means" under the DTSA, and in particular its application to the alleged misappropriation of the "bootloader."

### 1.   "Improper Means" Are Means that Fall Below the Standard of "Commercial Morality"

The Supreme Court has long stated that "[t]he maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law. The necessity of good faith and honest, fair dealing, is the very life and spirit of the commercial world." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481–82, 94 S. Ct. 1879, 1886, 40 L. Ed. 2d 315 (1974) (internal quotations and citation omitted).  "Improper means" must be understood in the context of trade secret law's stated policy of maintaining commercial ethics.

As the Fifth Circuit has noted, though "[a] complete catalogue of improper means is not possible," "[i]n general they are means which *fall below the generally accepted standards of **commercial morality** and reasonable conduct*." *E.I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1016 (5th

TROJAN LAW OFFICES
BEVERLY HILLS

Cir. 1970) (citing Restatement of Torts § 757, comment f at 10 (1939)) (emphasis added; internal quotations omitted).  In *E.I. duPont deNemours & Co.*, the Fifth Circuit discussed commercial morality under Texas trade secret law:

> "[T]he undoubted tendency of the law has been to recognize and **enforce higher standards of commercial morality** in the business world." [citation omitted] …[T]he **proper** means of gaining possession of a competitor's secret process is "through inspection and analysis" of the product in order **to create a duplicate**. [citation omitted] … "The means by which the discovery is made may be obvious, and the experimentation leading from known factors to presently unknown results may be simple **and lying in the public domain**. But these facts do not destroy the value of the discovery and **will not advantage a competitor who by** *unfair* **means obtains the knowledge** *without paying the price expended by the discoverer*." …One may use his competitor's secret process if he discovers the process by reverse engineering applied to the finished product; one may use a competitor's process if he discovers it by his own independent research; ***but one may not avoid these labors*** by taking the process from the discoverer without his permission at a time when he is taking reasonable precautions to maintain its secrecy. **To obtain knowledge of a process** *without spending the time and money* **to discover it independently is improper**….

*E. I. duPont deNemours & Co. v. Christopher*, 431 F.2d at 1015–16 (emphasis added); *see also*, *Phillips v. Frey*, 20 F.3d 623, 630 (5th Cir. 1994) (noting "our devotion to free wheeling industrial competition must not force us into accepting the law of the jungle as the standard of morality expected in our commercial relations." (quoting *E.I. duPont deNemours & Co.*, 431 F.2d at 1016); *Shapiro v. Hasbro Inc.*, No. 215CV02964BROAJW, 2016 WL 9137526, at *2 (C.D. Cal. July 20, 2016) ("the public has a strong interest in ensuring that standards of commercial morality are reinforced by trade secret law" (citing Cal. Civ. Code § 3426.1 (Legislative Committee Comment—Senate)).   In short, "commercial morality" is not an

TROJAN LAW OFFICES
BEVERLY HILLS

-2-

"anything-goes" or "anything-you-can-get-away-with" standard.    It is a broad standard that takes into consideration the basic fairness and honesty of the process used to analyze a competitor's trade secret.

### 2.    Defendants' Taking of the Bootloader Fell Below the Standard of Commercial Morality

Defendants' taking of ADS's bootloader to surreptitiously download firmware from ADS's server was improper because it violated the norms of commercial morality.

First, consider how Defendants took the bootloader.    Defendants did not "reverse engineer" it.  Under the DTSA, "reverse engineering" means "starting with the known product and ***working backward*** to find the method by which it was developed."    (§ 1. Definitions., Unif.Trade Secrets Act § 1 (emphasis added).)  Defendants did not work backwards to understand the bootloader to make a better bootloader for its own products.

Indeed, there was no reason to reverse engineer the bootloader because ADS's bootloader was ████████████████████████████████████████ ███████████████████████████████████████████ (Dkt. #284-2: Zeidman Rpt. at ¶ 68.) ████████████████████████████████████ ████████████████████████████████████████ (*Id*. at ¶ 65.) ADS's  bootloader  does  not  work  with  other  chips. ████████████ ████████████████████ (Dkt. #284-11: Andrews Rebuttal Rpt. at ¶44.)   Thus, ADS's bootloader does not work with Defendants' firmware.

Pingyang Xie, DEI's own Embedded Software Developer, testified that ADS's bootloader is unique to ADS:

TROJAN LAW OFFICES
BEVERLY HILLS

1   (Dkt. #284-6: Xie Depo. Tr. at 55:6-10.)   And as Mr. Zeidman explained at the

2   tutorial,

3

4   (Trojan Decl., Ex. 1:

5   Tutorial Tr. at 55:1-7.)   Hence, there was never any legitimate engineering reason for

6   Defendants to take ADS's bootloader.

7          That Defendants did not legitimately reverse engineer the bootloader is clear

8   from the fact that they did not use a clean room.   As Mr. Zeidman explained at the

9   tutorial:



10

11

12

13

14

15

16

17   (Trojan Decl., Ex. 1: Tutorial Tr. at 27:22 – 28:6.)[1]   Defendants did not independently

18   rewrite the bootloader from scratch after studying it.

19          Rather, Xie testified that the only reason Defendants took ADS's bootloader

20   was



21

22

23

24   _____

25   [1]

26

27

28

TROJAN LAW OFFICES
BEVERLY HILLS

(Dkt. #284-6:  Xie Depo. Tr. at 52:14-22 (emphasis added).)  This was documented in his 2015 Goals & Objectives, where he stated that the goal was ███████ ██████████████████████████████ (Dkt.  #284-14:   DEI-ADS_00026913 (emphasis added).) This is the very definition of improper. *E. I. duPont deNemours*, 431 F.2d at 1015 ("To obtain knowledge of a process *without spending the time and money* to discover it independently is improper…" (emphasis added)).  Xie achieved his stated goal, for example, by using ADS's bootloader for ███████████

(Dkt. #284-6:  Xie Depo. Tr. at 199:16-24 (emphasis added).)

Defendants' taking of the bootloader not only fell below the standard of commercial morality, it was, in fact, unlawful because Defendants necessarily copied ADS's copyrighted code in the bootloader.  ADS asserted a copyright claim based on the bootloader. (Dkt. #54 at ¶80.)  Since the copyright law sets at least a minimum standard of commercial morality, Defendants' copyright infringement of the bootloader is by definition commercially immoral because it is unlawful.

In short, as Xie admitted, ████████████████████

Thus, on the facts of this case, Defendants' taking of the bootloader was not by fair and honest means and their use of the bootloader was not commercially moral.

## B.    Trade Secret Can be Derived from OEM Sources

In the Tentative Order on the trade secret claim, the Court noted "Defendants argue that ADS does not own trade secrets in its immobilizer bypass solutions for General Motors, Toyota, Nissan, or Chrysler vehicles" because "ADS' alleged trade secrets were actually derived from OEM technology." (Dkt. #385 at p. 11.)   The Court requested briefing on the following questions: "(1) Can an entity have valid ownership of a 'trade secret' that resulted from reverse engineering of another company's source code?; (2) If so, must the technology or codes be materially different?; (3) If so, to what extent must the technology over which the trade secret is asserted be different than the original technology?" (*Id*.)

The answer to the first question is yes.  The Ninth Circuit teaches that "a trade secret may consist of a compilation of data, public sources or a combination of proprietary and public sources":

> The thrust of Nosal's argument is that the source lists are composed largely, if not entirely, of public information and therefore couldn't possibly be trade secrets. But he overlooks the principle that a trade secret may consist of a compilation of data, public sources or a combination of proprietary and public sources. It is well recognized that ["]it is the secrecy of the claimed trade secret as a whole that is determinative. The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements....["]

*United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016) (citations omitted);  *Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) ("[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable trade secret." (citations omitted)).  For example, courts have found that the compilation of customer lists can constitute trade secret. *Pyro*

TROJAN LAW OFFICES
BEVERLY HILLS

*Spectaculars N., Inc. v. Souza*, 861 F.Supp.2d 1079, 1089 (E.D. Cal. 2012) ("[W]here the party compiling the customer lists, while using public information as a source, ... expends a great deal of time, effort and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection.") (quoting *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 147 F.Supp.2d 1057, 1066 (D. Kan. 2001)).

Similarly, just as the compilation of public information could be transformed into a trade secret, ADS took non-secret OEM source code from car makers and modified it in such a way as to make it ADS's own. As Mr. Zeidman opined in his report:



(Dkt. #284-2: Zeidman Rpt. at ¶ 53.; *see also*, Trojan Decl., Ex. 1: Tutorial Tr. at 28:24 – 29:16.)



(*Id.* at 28:24 – 29:16.)

(*Id.*)

(*Id.*) ADS's did not copy the OEM algorithms to make a duplicate immobilizer; rather, ADS reverse engineered the OEM algorithms to make its own

TROJAN LAW OFFICES
BEVERLY HILLS

algorithms for picking the lock of the OEM immobilizer. Thus, what DEI took was not the OEM algorithms for the immobilizer itself, but rather, ADS's trade secret solutions for picking the lock of the OEM immobilizer.

Therefore, the answers to the Court's second and third questions are also yes. At the very least, whether or what extent ADS code is materially different from OEM code are questions of fact that would be inappropriate to resolve on summary judgment.

## II.   SUPPLEMENTAL BRIEFING REGARDING THE '780 PATENT

### A.   Supplemental Briefing on the Invention

At the November 1 tutorial, the Court asked regarding the '780 Patent: "[W]hat exactly is the patent -- what is being patented?" (Trojan Decl., Ex. 1: Tutorial Tr. at 8:7-8.)

Claim 1 claims "A method to remotely flash an external module…" (Dkt. #1-1 at 5:20.) Similarly, Claim 15 claims "A system to remotely flash an external module…" (*Id.* at 6:39.) As ADS explained in its summary judgment motion, it is this set up for flashing that is innovative because it enables an empty module to be universally adaptable:

> ADS's '780 Patent…relates to a system and a method to remotely program, or "flash," a *universal* remote starter to make it compatible with a particular make and model of vehicle….The '780 Patent claims a universal aftermarket remote starter that can be uniquely programmed at the time of installation for a specific vehicle make and model.

(*Id.* at 4:1-8 (emphasis added).) The ability to "remotely flash" the module is what allows ADS to sell a universally adaptable starter for different makes and models of vehicles. Mr. Zeidman explained at the tutorial:



TROJAN LAW OFFICES
BEVERLY HILLS

1

2

3   (Trojan Decl., Ex. 1: Tutorial Tr. at 8:21-22, 9:11-15.)

4        The "third computer program" limitation (in Claim 1) and the "new computer

5   program" (in Claim 15) must be understood in the context of the objective of the

6   invention, *i.e.*, "to remotely flash an external module…".

7       **B.**    **Supplemental Briefing on the "Computer Program" Limitations**

8        The key infringement issue as to the '780 Patent is whether Defendants'

9   accused system generates "a new computer program" as claimed in Claim 15. There

10  is no dispute as to meaning of "computer program," which is ordinarily understood

11  to mean: "A set of instructions in some computer language intended to be executed

12  on a computer so as to perform some task." (Dkt. #296-2 at 62:3-8.)[2]  Defendants

13  contend that their accused system generates just a "key," not a "program," because

14  they contend their key lacks the necessary instructions for execution.

15      In the Tentative Order on the patent claims, the Court noted:

16          Plaintiff itself does not dispute that a "computer program" can be

17          understood in the context of the '780 Patent to mean "a set of
        instructions executed by a computer to perform a task."…

18          However, in its reply in support of its own Patent Motion,

19          Plaintiff appears to pivot to an argument that a "computer
        program" is simply any "set of instructions," whether or not those

20          instructions are themselves "executed" by the computer that

21          receives them….The Court finds Plaintiff's position would
        impermissibly expand the meaning of "computer program" to

22          cover any expanse of computer-readable instructions or

23          messages, whether or not the instructions or messages themselves
        actually constitute an executable program.

24

25

26  [2] *See, e.g.*, The New IEEE Standard Dictionary of Electrical and Electronics Terms

27  (Fifth Ed. 1993) (computer program: "A sequence of instructions suitable for
processing by a computer.") (Trojan Decl., Ex. 5.).

28

TROJAN LAW OFFICES
BEVERLY HILLS

1  (Dkt. #384 at pp. 8-9.)  ADS does not take the position that any "set of instructions"

2  qualify as a "computer program."  It is ADS's position that Defendants' Key2Go

3  system generates a set of instructions that are executed by the DEI vehicle module to

4  process the key.

5  **1.    Key Data and Firmware Are Written to the Module**

6  As Mr. Kovanis opined in his June 27, 2019 report:



12  (Dkt. 246-5 at p. 59/330 (emphasis added).)  Mr. Kovanis clearly states that the key

13  *and* firmware are written to the module.    "Firmware" is well understood as

14  instructions.  According to TechTerms.com, "Firmware is a software program or **set**

15  **of instructions** programmed on a hardware device. It provides **the necessary**

16  **instructions** for how the device communicates with the other computer hardware."

17  (https://techterms.com › definition › firmware.)  Thus, the server generates a "new

18  computer program" because Mr. Kovanis explains that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (Dkt. 246-5 at p. 59/330 (emphasis added).)  Mr.

20  Kovanis could not have been any clearer as he reiterated this point *nine* times

21  throughout his report.  (Dkt. 246-5 at pp. 59/330, 133/330, 207/330, 283/330 and Dkt.

22  #246-6 at 28/383, 103/383, 179/383, 254/383, and 331/383.)

23  Though Mr. Kovanis repeated this assertion again and again, Defendants'

24  expert, Mr. Scott Andrews, admitted that he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26

27

28

TROJAN LAW OFFICES
BEVERLY HILLS

(Dkt. #246-9: Andrews Depo. Tr. at 79:5-12 (emphasis added).)

Mr. Kovanis responded to Mr. Andrews' rebuttal, explaining in his deposition that the key is written to the DEI module by a third computer program:

(Trojan Decl., Ex. 6:  Kovanis Depo. at 92:1-13 (emphasis added).)  Further:



(Trojan Decl., Ex. 6:  Kovanis Depo. at 94:11 – 95:17 (emphasis added).)

        Mr. Kovanis explained that



(Trojan Decl., Ex. 6:  Kovanis Depo. at 87:1-18 (emphasis added).)  This means that the key is transferred to the module along with instructions to tell the module how to use the data.

        Defendants have never presented evidence during regular or expert discovery to dispute Mr. Kovanis's contentions.  The best they could do was argue at the hearing that the "screenshot says the key is sent."  (Trojan Decl., Ex. 7 at 18:8-9.)

TROJAN LAW OFFICES
BEVERLY HILLS

This is a specious argument because the user does not need to be informed about the specific computer instructions provided along with the key, which enable the module to accurately process and store the key. This is akin to arguing that a computer is not running any programs just because the computer screen does not explicitly say the computer is running a program.  The user is not concerned with that.  All the user wants to know is that the new key has been loaded into the module and that the module is ready to bypass the immobilizer.

### 2.    That Key Data Includes Instructions Is Not a New Theory

Lastly, Mr. Kovanis's explanation that Defendants' Key2Go generates a new computer program based on information retrieved from the key data is not "a new infringement theory based on a new analysis of the accused product." (Dkt. #384: Tentative Order at pp. 7-8.)  Mr. Kovanis's explanation was set forth in his June 27, 2019 report.  (Dkt. #246-5 and 246-6.)  There was no distinction made between key data and the instructions that go along with them because Defendants never asserted non-infringement based on this spurious distinction.

In discovery, Defendants never took the position that their products do not meet the third computer program limitation because executable instructions are not sent with the key data to the DEI module.   When ADS asked Defendants for documents explaining why they "do not infringe any claims of the '780 Patent," Defendants did not produce any documents in response.  (Trojan Decl., ¶3; Ex. 2: Request for Production No. 100.)  Hence, Defendants cannot now be heard to argue that they have any evidence to support their argument that the key data is sent to the module without instructions.

### III.   SUPPLEMENTAL BRIEFING REGARDING THE '185 PATENT

### A.    Supplemental Briefing on the "Flywheel" Limitation

TROJAN LAW OFFICES
BEVERLY HILLS

-13-

1    The asserted claims of the '185 Patent all require an "engine having a flywheel

2 attached thereto…" (Dkt. #214-2 at 12:48-49.) ADS requests the Court to make a

3 ruling on whether ADS's accused products meet the "flywheel" limitation.

4    ADS argued in its Opening Briefing that "[t]he '185 Patent applies only to

5 vehicles having a manual transmission (*i.e.* possessing a flywheel). Since only

6 vehicles possessing a manual transmission, not an automatic transmission, have a

7 flywheel, even if ADS is found to infringe, damages would be limited to manual

8 transmission vehicles." (Dkt. #216-1 at p. 13, fn. 8.)

9    Defendants argued in their Opposition that "the term "flywheel" is understood

10 in the industry to encompass "flexplates," which are used in automatic transmission

11 vehicles.…A person of ordinary skill in the art would therefore read the '185 patent's

12 claims as covering functionality for both manual and automatic transmission

13 vehicles." (Dkt. 248-1 at p. 17, fn. 6 (internal citations omitted).)

14    Mr. Kovanis explained in his report that a flywheel is associated with manual

15 transmission vehicles and is distinguishable from flexplates, which are used in

16 automatic transmission vehicles:



17

18

19

20

21

22

23

24

25

26

27

28

TROJAN LAW OFFICES
BEVERLY HILLS



(Dkt. #216-6 at ¶17-19.)

The term "flexplate" does not appear anywhere in the file history of the '185 Patent. (Trojan Decl., Ex 3.) Defendants cannot impermissibly broaden the scope of their claims to contradict the plain meaning of the limitations.

**B.    Supplemental Briefing on the Voltage Patterns and Frequency Limitations**

In the Tentative Order on the '185 Patent, the Court commented:

> [I]t seems that the parties have presented one or more claim construction disputes regarding the meaning of the claim phrase "detect a first pulsed voltage pattern and a second pulsed voltage pattern . . . the second pulsed voltage pattern having a higher frequency than the first pulsed voltage pattern." These might

-15-

1
2
3

> include disputes regarding the meaning of the terms "**voltage pattern**" and "**frequency**." …More information is required from the parties before the apparent claim construction dispute(s) regarding this limitation can be resolved.

4   (Dkt. #384 at p. 11 (emphasis added).)

5   **1.    Review of the '185 Patent's Disclosure**

6   The construction of "voltage pattern" and "frequency" cannot be so broad as

7   to read on the prior art since all other limitations are already in the prior art.  In the

8   Background section of the '185 Patent, it is admitted that engine-start confirmation

9   systems in the prior art worked by monitoring voltage range:

10
11
12
13
14
15

> Other systems have relied on detecting the output from an alternator/generator. The alternator/generator output passes through a voltage regulator, **from which the voltage can be monitored.** After an engine has successfully started and is running smoothly, the voltage output should be **in the range** of 13.6 to 14 Volts. **When the detection circuit detects a voltage within this range,** the starter is then disengaged from the engine flywheel.

16
17   (Dkt. #214-2: '185 Pat. at 1:44-56 (emphasis added)).   The meaning of the claim

18   limitation "detect a first pulsed voltage pattern and a second pulsed voltage pattern"

19   cannot be so broad as to read on the prior art, which "detects a voltage within [a]

20   range." (Dkt. #214-2: '185 Pat. at 1:49-50.)  What purportedly distinguishes the '185

21   Patent's claimed invention over the prior art is that it detects and compares *patterns*

22   of voltages.

23   The '185 Patent teaches that the remote engine starter monitors and compares

24   voltage patterns "before, during, and after a remote start engine start procedure."

25   (Dkt. #214-2: '185 Patent at 4:45, 9:25-26.)  This is shown in Figure 3, which depicts

26   a "first pulsed voltage pattern" [B] and a "second pulsed voltage pattern" [C].

27
28

TROJAN LAW OFFICES
BEVERLY HILLS

1
2
3
4
5
6
7



FIG. 3

8
9
10
11
12
13
14
15

When a monitoring circuit determines that the second pulsed voltage pattern has a higher frequency than the first pulsed voltage pattern, then a signaling circuit signals the starter to disengage.  This is shown in Figure 3 above where the frequency during time period C is greater than during time period B (as indicated by the fact that the pulses are closer together in C than in B).  When the pulse monitoring circuit detects this change in the frequency of the two pulse voltage patterns, the processor turns off the starter:

16
17
18
19
20
21

> When pulse monitoring circuit **24** detects the termination of a first pulsed voltage pattern and the start of a second pulsed voltage pattern, the second pulsed voltage pattern having a higher frequency than the first pulsed voltage pattern, a signal will be sent back to processor **22** to disengage starter motor **80** from the flywheel, with processor **22** then sending a signal to starter enabling means **26** to disengage starter motor **80** from the flywheel.

22

(Dkt. #214-2: '185 Pat. at 7:28-36).

23

**2.    Construction of "Voltage Pattern" and "Frequency"**

24
25
26
27

The definitions for voltage pattern and frequency and their relationship to each other can best be explained as follows:  Alternating current (AC) is the type of current used to start vehicles.  When one observes AC current using an oscilloscope, one can observe the current's voltage as a wave form.  This wave form is caused by the fact

28

TROJAN LAW OFFICES
BEVERLY HILLS

that the current is alternating from positive to negative and back again (i.e., alternating current).

When the wave form consistently repeats itself, one can observe a voltage pattern. The frequency of the voltage pattern is measured by the number of waves within a given time period. Comparing the frequency of two different voltage patterns simply means that you are counting the number of waves of the two voltage patterns. If there are more waves in the second pattern, then the second pattern has a higher frequency than the first pattern.

Hence, a voltage pattern is merely a wave form that consistently repeats itself for a given period of time. The frequency of the voltage pattern is the number of waves in the voltage pattern. Support for these definitions comes from the '185 specification, particularly Figure 3 and its description, and from basic physics.

In the '185 Patent, the "pulsed voltage patterns" are patterns of recurring pulses (*i.e.* spikes in voltages) that repeat in an upward trend as shown in Fig. 3. The "monitoring circuit" is "configured to *detect*" the "pulsed voltage patterns," meaning that it has to be able to ascertain recognizable patterns from the collection of pulses. To be clear, ADS is *not* arguing that the '185 Patent requires constant or continuous monitoring to recognize patterns.[3] But the '185 Patent does require the "monitoring circuit" to monitor the voltages until it discerns a "first voltage pattern" and a "second voltage pattern" and then *detects* when the second pattern has a "higher frequency" of pulsed voltages than the first pattern.

ADS's accused products do not detect patterns of pulsed voltages based on frequency. That is, ADS's accused products do not look for regular or intelligible

---

[3] As the Court noted, "the Claim Construction Ruling already specifically found that "the intrinsic record does not require that the monitoring circuit be constantly/continuously monitoring even during the start-up sequence." (Dkt. #93 at 11.)

TROJAN LAW OFFICES
BEVERLY HILLS

patterns based on a change in the frequency of the voltage pulses.  Rather, ADS's accused products measure discrete voltages.  It would not matter if the frequency fluctuates randomly.   ADS's accused products do not detect patterns based on frequency because the products take the average voltage value and compares that average to a preset threshold to determine when the engine has started.  In other words, ADS seeks to measure when the voltage has exceeded a specific value that indicates that the vehicle engine is running.  To say that ADS's products detect pulsed voltage patterns because they measure discrete voltage values is like saying a system detects a song consisting of a specific pattern of notes when the system only detects discrete sounds without looking for the pattern.

As Mr. Kovanis explained in his report, ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████   (Dkt. #216-6:  Kovanis Rebuttal at ¶ 27 (emphasis added).)

Mr. Kovanis goes on to explain:



(Dkt. #216-6:  Kovanis Rebuttal at ¶ 31 (emphasis added).)

As to the frequency, the Court noted that "[t]he claim language does not require that the monitoring circuit 'directly measure a frequency,' as Plaintiff's positions would suggest. It simply requires detecting two 'voltage pattern[s],' where

TROJAN LAW OFFICES
BEVERLY HILLS

those voltage patterns 'hav[e]' certain frequencies.'" (Dkt. #384 at p. 11.)  Even if the claim language does not expressly require the monitoring circuit to directly measure a frequency, in order for the monitoring circuit to know when the second pulsed voltage pattern has a higher frequency than the first pulsed voltage pattern, it must still indirectly compare the frequencies of the two patterns.  As Mr. Kovanis explained, ADS's products operate differently because ████████████████

████████████████████████████████████████

████████████████████  (Dkt. #216-6: Kovanis Rebuttal at ¶ 28.)

Therefore, ADS does not infringe the '185 Patent.

## IV.   SUPPLEMENTAL BRIEFING REGARDING THE '386 PATENT

The Court did not invite claim construction of the '386 Patent.  However, construction of "key switch" is appropriate because ADS respectfully submits that the Court's tentative ruling is based on a misinterpretation of "key switch."  In the Tentative Order, the Court noted that "Defendants have the better argument regarding the meaning of the term 'key switch' as including the key switch cover" because Figure 3A depicts "translucent key switch 42, 44, 46, 48 and it illuminates (or flashes) when a confirmation signal has been received." (Dkt. #384 at p. 15, citing '386 Patent at 4:1-5.)  The interpretation of "key switch" to include the cover is contrary to the prosecution file history.

In the '386 Patent file wrapper, the applicant originally claimed two embodiments: in original Claim 1, the light source is beneath a "translucent key switch"; whereas, in original Claim 17, the light source is beneath a "cover":

Claim 1:

```
a light source beneath said translucent key switch to
illuminate said translucent key switch when said
acknowledgement signal has been received; and
```

Claim 17:

TROJAN LAW OFFICES
BEVERLY HILLS

1

2

3

4

5

```
17. A method as claimed in claim 11, wherein said providing
said handheld transceiver with a user interface comprises
providing said at least one key switch with a translucent
cover and a light source beneath said cover, and said light
source illuminates upon said releasing pressure on said key
switch if said acknowledgement signal has been received.
```

6

(Trojan Decl., Ex. 4 (emphasis added).)

7

8        The examiner rejected all claims on March 4, 2008, noting in relevant part

9    regarding claim 17:

10              But the combination of Irvin and He fails to disclose said providing said handheld

11              transceiver with a user interface comprises providing said at least one key switch with a

12              translucent cover and the light source is beneath said cover, and said light source

13              illuminates upon said releasing pressure on said key switch.

(Trojan Decl., Ex. 4: 2008-03-04 Office Action at p. 14.)   In response to the rejection,

14    the applicant canceled claim 17 and amended claim 11 on August 1, 2008 to include

15    a "translucent cover":

16

17              providing said handheld transceiver with a user interface having at least one key

18              switch to activate transmission of said data signal, said at least one key switch having a

19              translucent cover and a light source beneath said translucent cover;

20

21    (Trojan Decl., Ex. 4: 2008-08-01 Amendment at p. 4.)   The applicant argued that

22    "Irvin fails to teach the 'key switch having a translucent cover and a light source

23    beneath said translucent cover'…"   (Trojan Decl., Ex. 4: 2008-08-01 Remarks at p.

24    9.)

25        In a Final Rejection on November 12, 2008, the examiner again rejected the

26    claim, but noted:

27

28

TROJAN LAW OFFICES
BEVERLY HILLS

Irvin discloses a light source (via indicator 24, Col. 3, lines 41-52; and Col. 4, lines 39-47) to generate light informing a user that the acknowledgement signal was received, but fails to disclose the key switch is translucent, and the light source is beneath said translucent key switch to illuminate said translucent key switch.

(Trojan Decl., Ex. 4: 2008-11-12 Final Rejection at p. 5.)

The claims, in their final form as granted, maintain the distinction between the light source being under the translucent key switch (Claim 1) as opposed to being under the translucent cover (Claim 9):

Claim 1:

>…at least two light sources, each beneath a corresponding one of said at least two translucent key switches to illuminate said corresponding one of said at least two translucent key switches…

Claim 9:

>…each one of said at least two key switches having a translucent cover and a light source beneath said translucent cover…

(Dkt. #214-3.)  **Defendants elected to assert infringement only of Claim 1, not Claim 9.**  (Dkt. #131-5 at p. 1/7.)

In short, throughout the prosecution history Defendants made amendments and arguments based on a distinction between the "key switch" and the "cover." Therefore, Defendants cannot now argue that the "cover" is part of the "key switch," and that the light source being beneath the "key switch" is the same as being beneath the "cover," especially as they did not assert infringement of Claim 9, which is the claim that makes a specific reference to a "key cover."

## V.   SUPPLEMENTAL BRIEFING REGARDING THE '400 PATENT

Claim 1 of the '400 Patent claims in relevant part:

TROJAN LAW OFFICES
BEVERLY HILLS

1. A vehicle application wireless remote control communications system comprising:

… a remote unit… being operative to exchange data in a plurality of modulation modes…

… a mobile unit… operative to transmit and receive data in the plurality of modulation modes…

…a means for the communications system to select a selected modulation mode from among the plurality of modulation modes for exchange of data between said remote and mobile units…

(Dkt. #214-4: '400 Patent at 10:25-47.)   In the Tentative Order, the Court commented:

The parties have presented a claim construction dispute regarding the meaning of the claim phrase "operative to transmit and receive data in [a] plurality of modulation modes" and possibly the related phrase "means . . . to select a selected modulation mode . .. "

(Dkt. #384 at p. 13.)

Defendants argued in their opposition to ADS's summary judgment motion that:

[T]he accused feature of ADS's key fobs is the firmware-programmability of different modulation modes into ADS's key fobs. (*See Id*. ¶ 44.) This feature "allows for extensibility and upgradeability of hardware functionality without having to change chipsets." (*Id*.) In other words, future versions of ADS's key fobs may be modified to use different modulation modes depending on the needs of ADS's users without having to swap out hardware. Instead, ADS can simply reprogram the key fobs to use a different modulation mode.

(Dkt. #248-1 at 25:5-12.)   Being "operative to transmit and receive data in [a] plurality of modulation modes" does not mean "firmware-programmability of different modulation modes" at the factory.   As ADS previously argued, the modulation mode is preset when the remote is manufactured. (Dkt. #216-6: Kovanis Rebuttal Rpt. at ¶¶108, 109, and 114.)  Nothing in the patent itself or the prosecution history supports Defendants' broad argument that "operative" means reprogrammability of the modulation mode.

First, the specification states that "both the TX and the RX have the capability to communicate in AM or FM modes. They will change the active mode in the transceiver chip upon receipt of a signal from the baseband processor circuitry. (Dkt. #214-4:  '400 Patent at 7:11-14.)  This indicates that "operative" means an active operation by the remote, not merely the possibility of "firmware-programmability."

Second, the word "operative" is consistently used throughout the '400 Patent to refer to *user-selected* operations.  For example, Claim 1 recites "the remote unit further being operative to contain and transmit a representation of a user-selected vehicle application function…."  (Dkt. #214-4:  '400 Patent at 10:31-33.)  The word "operative" is not used to claim the ability to reprogram.

Third, "firmware-programmability of different modulation modes" at the factory is expressed in Claim 1 using the phrase "a selected modulation mode." But Claim 1 requires a "means…to *select* a selected modulation mode."   In other words, there has to be a means for the user to select from the plurality of modulation modes programmed at the factory.  ADS's accused remote control does not have a means for a user to select a selected modulation mode.  In fact, in accordance with FCC compliance test, ADS's accused products are only operable in a single modulation mode and are only allowed to operate in that modulation by law.  (Dkt. #216-6: Kovanis Rebuttal Rpt. at ¶¶100-101.)

TROJAN LAW OFFICES
BEVERLY HILLS

-24-

In short, to be "operative" means the remote can change modulation during operation to facilitate the transmission and receipt of signals. Defendants' position would remove the need for operability by simply focusing on reprogrammability. Thus, the Court was correct to note that "Defendants appear to have the weaker position. Their interpretation, at least when compared solely against the claim language, would seem to take away much of the significance and meaning of the 'operative to transmit and receive data in [a] plurality of modulation modes' limitation." (Dkt. #384 at p. 13.)

Respectfully submitted,

TROJAN LAW OFFICES
by

November 8, 2019                    /s/R. Joseph Trojan
                                     R. Joseph Trojan
                                     Attorneys for Plaintiff ADS

TROJAN LAW OFFICES
BEVERLY HILLS

-25-